The Weninegars filed a complaint against Lomas Nettleton Co., Manhattan Savings Bank, and Mortgage Corporation of the South, alleging negligence, breach of contract, and fraud for failing to pay a flood insurance renewal premium from the mortgage escrow account. The Weninegars amended their complaint to include their insurance agent, S.S. Steele Company, Inc., stating a cause of action for fraud for failing to notify them of the policy's cancellation. All defendants moved for and were granted summary judgment.
The Weninegars bought their house in 1955. The Manhattan Savings Bank (Bank) holds the mortgage on the house. The mortgage contains provisions requiring the Weninegars to pay insurance premiums in advance, with the money to be held in escrow by the Bank or its agent. The Weninegars were required under the mortgage to maintain fire and hazard insurance. The Bank retained the right to specify the types and amounts of insurance to be carried on the mortgaged premises. In 1960, *Page 952 
the Bank contracted with Mortgage Corporation of the South (MCS) to service the Weninegars' mortgage, including the handling of all escrow funds and insurance matters.
The Weninegars allege that in 1975 they received written notice from MCS, the Bank, and/or the Veterans Administration (VA) that they were required to obtain flood insurance. MCS contends that, according to Mr. Weninegar's deposition, he became interested in flood insurance because he saw an advertisement for it in a newspaper and that he purchased the insurance on his own volition and not because he was required to do so. The Weninegars purchased the flood insurance from S.S. Steele Company, their insurance agent. That agent allegedly designated on the insurance application that the Bank was to pay the renewal premium for the flood insurance when it became due. The Bank and MCS were sent copies of the application and the flood insurance policy, and MCS was allegedly notified to begin escrow for future payments. MCS denies receiving a notice to begin escrow. MCS never notified S.S. Steele Company that it would not begin escrow for the premiums. The Weninegars' mortgage payments increased approximately $4.00 per month after they applied for flood insurance. The Weninegars claim they received notice from MCS that the escrow payments increased to pay for renewal of the flood insurance. MCS says the increase was due to a shortage in escrow.
The policy went into effect on July 5, 1975, and the Weninegars paid the first year's premium in advance. On May 25, 1976, MCS was instructed by the Bank to forward the Weninegars' file and escrow fund to Lomas Nettleton Co. (L N), the Bank's new servicing agent on the Weninegars' mortgage. L N began servicing the mortgage on May 26, 1976, approximately six weeks before the renewal premium was due. Even though there were sufficient escrow funds, L N did not pay the renewal premiums on the flood insurance. MCS, L N, and S.S. Steele 
Company, all received copies of the renewal notice, but none of them notified the Weninegars that the premium was due. The insurance policy lapsed for nonpayment.
Hurricane Frederic struck on September 12, 1979, and the Weninegars' house was flooded. The Weninegars were subsequently informed they had no coverage.
Steele reviewed the Weninegars' insurance file to find out what happened to the flood insurance. Mr. S.S. Steele of S.S. Steele Company allegedly told the Weninegars that he had not received any notices on the insurance but that if his company was responsible for the cancellation of the insurance then the plaintiffs could sue it. The plaintiffs claim that they did not sue Steele's company initially because of these representations.
On March 26, 1980, the Weninegars filed a complaint in the Mobile Circuit Court, naming L N, the Bank, and MCS as defendants, and alleging negligence, breach of contract, and fraud for failing to pay the flood insurance renewal premium from the mortgage escrow account. Mr. Steele's deposition was taken and a renewal notice on the plaintiffs' flood insurance was produced by Steele on January 26, 1981. In August 1981, the complaint was amended to substitute S.S. Steele Company for a fictitious party named in the original complaint, stating a negligence claim against S.S. Steele Company. In January 1982, the complaint was again amended to state a cause of action for fraud against S.S. Steele Company. All defendants moved for and were granted summary judgments.
The following issues are presented for this Court's review:
I. Does Alabama have in personam jurisdiction over the Bank?
II. Is there a scintilla of evidence to support the Weninegars' allegation of breach of contract as against the Bank and MCS?
III. Is there a scintilla of evidence to support the Weninegars' allegations of breach of contract as against L N? *Page 953 
IV. Has the statute of limitations run on the causes of action alleging negligence against the Bank, MCS, and L N?
V. Is there a scintilla of evidence to support the Weninegars' allegation of negligence against MCS and L N?
VI. Is the Bank vicariously liable for negligence for the acts of its agents, MCS and L N?
VII. Is there a scintilla of evidence to support the Weninegars' allegations of fraud against the Bank, MCS, and L 
N?
VIII. Is there a scintilla of evidence to support the Weninegars' allegation of fraud against S.S. Steele Company?
 DISCUSSION OF THE ISSUES
I. Does Alabama have in personam jurisdiction over the Bank?
The Bank contends that Alabama does not have in personam
jurisdiction over it because it is a nonresident, with offices only in New York. The Bank argues further that the mere holding by a foreign corporation of a mortgage on Alabama property does not constitute doing business in Alabama, Ala. Const. of 1901, amendment 154; and, therefore, that Alabama cannot obtain jurisdiction over the Bank by using the long-arm statute (rule) because Rule 4.2 (a)(2), A.R.Civ.P., is subordinate to the provisions of the Alabama Constitution.
Ala. Const. of 1901, amend. 154, § 1, provides:
 "Any corporation which is not organized under the laws of this state and has no place of business in this state may take and hold mortgages on real property located within this state, . . . [and] collect the debts secured thereby . . . and no such foreign corporation shall be deemed to be doing business in this state solely by reason of doing any or all of the acts designated herein. . . . Any [such] foreign corporation . . . may sue or be sued in this state in relation to any such mortgages held by it. . . ."
Rule 4.2 (a)(2) provides that "[a] person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's . . . (F) having an interest in, using, or possessing real property in this state." We do not find the procedural rule to be inconsistent with the constitutional amendment.
In Midwest Homes Acceptance Corp. v. Langdon, 287 Ala. 521,253 So.2d 29 (1971), we stated that Amendment 154 was "designed to permit foreign corporations to lend money to residents of Alabama and to take security for such loans in the form of mortgages on real property located within the state, and to enforce such obligations in the courts of Alabama."287 Ala. at 523, 253 So.2d at 30. Prior to adoption of Amendment 154, all contracts made in this state by any foreign corporation which had not first qualified to do business in Alabama were void at the option of the other party to the contract. Code 1940, Title 51, § 342. After the adoption of Amendment 154, the Legislature amended the foreign corporation statute to provide that any contract made in this state by a corporation which has not yet qualified to do business in this state is void at the option of the other party to the contract "unless said contract . . .consists of a mortgage upon real property." Code 1975, §40-14-4 (emphasis added).
Clearly, the sole purpose of the constitutional amendment was to allow a foreign corporation to enforce a mortgage agreement on Alabama property. Moreover, the express langauge of the amendment is that a foreign corporation holding a mortgage on Alabama property "may sue or be sued in this state in relation to any such mortgages held by it." It seems to be the position of the Bank that this language would allow only causes of action related to the validity of the mortgage itself or the indebtedness secured thereby. We find this position to be untenable. Instead, the suit is "in relation" to the mortgage if it is brought as a result of an alleged failure of a party to meet any obligation provided for in the terms of the mortgage. In the *Page 954 
present case, the mortgage agreement provided that the mortgagor would pay into escrow premium amounts on "fire andother hazards insurance" and that the mortgagee's servicing company would then pay the premiums when due; the plaintiffs alleged that the Bank failed to meet this obligation by failing to pay the flood insurance premiums.
Alabama courts do have in personam jurisdiction over the Bank by virtue of Amendment 154 and Rule 4.2 (a)(2)(F). We find that there are sufficient contacts between Alabama and the Bank to make it fair and reasonable that the Bank come to Alabama to defend.
II. Is there a scintilla of evidence to support the Weninegars' allegation of breach of contract as against the Bank and MCS?
The plaintiffs argue that they were required, under the mortgage, to maintain insurance against fire and other hazards as specified by the Bank and to pay the premium sums into escrow. They claim they were notified that they were required to obtain flood insurance, and that they did so, naming the Bank as the party to pay renewal premiums. They argue that there was thus a valid and binding agreement between themselves and the Bank, which the Bank breached by failing to pay the flood insurance renewal premiums when they came due.
In July 1975, the same month the policy became effective, the plaintiffs' escrow payments increased by $4.00 per month. The plaintiffs allege that they were told that the increase was to pay for the flood insurance premiums. The Bank and MCS claim that they did not require the Weninegars to purchase flood insurance and, furthermore, that the escrow payment increases were "attributable to a concomitant increase in annual premiums on hazard insurance." Since there was a question of fact as to whether the Weninegars were required by the Bank to purchase flood insurance and as to the reason for the increase in escrow payments, we find that there was a scintilla of evidence on the issue of breach of contract by the Bank.
The plaintiffs claim breach of contract on the part of MCS by claiming to be third-party beneficiaries of the service contract between MCS and the Bank. (The issue of third-party beneficiary status is discussed in some depth in our discussion of Issue III.) About six weeks prior to the renewal date for the flood insurance, the Bank instructed MCS to transfer the Weninegars' mortgage file to L N. MCS claims it transferred the file, but L N denies receiving any documents, in particular the renewal notice, from MCS. MCS further claims that it was not the servicing company on the date the policy lapsed, and, thus, that it could not have notified the Weninegars of a lapse it was not aware of.
Summary judgment on the breach of contract claim against MCS was improper because of the factual disputes, such as whether the Weninegars were told that they were required to purchase flood insurance, whether the increase in escrow payments was to take care of flood insurance premiums, whether MCS properly serviced the mortgage, and whether MCS forwarded the Weninegars' file to L N.
III. Is there a scintilla of evidence to support the Weninegars' allegations of breach of contract as against L N?
The Weninegars alleged breach of contract against L N on the basis of an implied contract between L N and the Bank as to which the Weninegars are third-party beneficiaries. The Weninegars claim that L N breached the implied contract when it did not pay the flood insurance renewal premium when it became due. They argue that L N should have notified them if it did not intend to pay the premium from escrow. L N argues that it did not have a duty to maintain the flood insurance because the Bank did not require the plaintiffs to obtain the insurance and because there was no evidence that L N agreed to assume the duty of escrowing funds or paying flood insurance premiums. Finally, L N argues that the Weninegars were not third-party beneficiaries because *Page 955 
the implied contract was not for their direct benefit.
Because the Bank changed servicing companies, with L N performing the same duties previously performed by MCS, there was clearly an implied contract between L N and the Bank. As to whether the Weninegars were third-party beneficiaries of the implied contract, two cases in particular are especially helpful.
In Beverly v. Macy, 702 F.2d 931 (11th Cir. 1983), the court held that the plaintiff was a third-party beneficiary of a service agreement between National Flood Insurers Association and the insurer responsible for servicing the plaintiff's flood policy. The court examined the significance of the intentions of the parties and the plaintiff's reliance as they bore on her status as a third-party beneficiary:
 "[A]ppellee argues that the parties to the contract did not intend to bestow a benefit upon Mrs. Beverly, and that, at most, she was an incidental beneficiary of the service agreement. . . . However, the economic motivation of the parties is not dispositive; rather, `the intention of the parties disclosed by the writing and surrounding circumstances known to the parties, and not their motive, determines the rights of the third-party beneficiary.' [Citations omitted.] . . . Thus, the question of `intent to benefit' is more complex than an inquiry into whether the primary or sole purpose (or motive) was to benefit a nonparty to the contract.
 "In probing the intention of the parties, reliance on the part of the putative third-party beneficiary can be a significant factor. See Restatement (Second) of Contracts § 302, Comment d. Here, this factor weighs heavily in favor of Mrs. Beverly. Through 1976, she was aware that premium due notices had arrived annually, and her undisputed expectation was that this practice would continue. In our view, this reliance was reasonable, and its reasonableness strongly suggests that the parties contemplated a direct benefit to her through the NFIA's assumption of an obligation to send renewal notices. While this reliance, by itself, would not allow a court to read into the contract terms that do not exist (see 4 Corbin, Contracts § 779B), Mrs. Beverly's conduct when combined with the express obligations incorporated into that contract strongly suggests that she was a direct beneficiary rather than an incidental one." 702 F.2d at 941-42 (emphasis in Beverly).
In Harris v. Board of Water and Sewer Comm'rs of Mobile,294 Ala. 606, 320 So.2d 624 (1975), this Court held that the plaintiff was a third-party beneficiary of a contract between the city and the board of water and sewer commissioners wherein the board was charged with the water and sewer responsibilities; thus, plaintiff was allowed to maintain an action against the board for breach of contract when plaintiff's motel and restaurant were destroyed by fire because the fire hydrants at the scene were dry. In Harris, we reasoned as follows in determining that the plaintiff was a third-party beneficiary:
 "In our present situation, how can it be said that Harris is not the very party for whose benefit the contract was made? We agree that the City itself enjoys some degree of direct benefit from [its] contract with the Board since its own property is protected. But, in the end, the most direct benefit inures to the people of the City, like Harris, who rely on these city-provided services for the protection of their property. This is not to say that the Board is an insurer against all fire losses, but it should be answerable to all those who are injured by its breach of the contract to supply water or its negligent maintenance of nonfunctioning fire hydrants where damage results proximately therefrom. We find that the facts alleged are sufficient to show that benefits of the contract in question flow to Harris, and thus make him a third-party beneficiary entitled to sue on the contract for its breach."
294 Ala. at 611, 320 So.2d at 628. The present case is analogous to the aforementioned cases; therefore, we find that *Page 956 
plaintiffs are third-party beneficiaries of the contracts between the Bank and MCS and the Bank and L N. Since there was a question as to whether the Weninegars were required to purchase the flood insurance and whether L N received the premium notice, summary judgment was improper.
IV. Has the statute of limitations run on the causes of action alleging negligence against the Bank, MCS, and L N?
Defendants allege that the issues of negligence are barred by the one-year statute of limitations because the Weninegars suffered legal injury in 1976 when the policy lapsed, yet did not file suit until 1979. Defendants rely on the recent cases of Armstrong v. Life Insurance Co. of Virginia, 454 So.2d 1377
(Ala. 1984) (medical insurance policy); Moore v. United StatesPipe Foundry Co., 384 So.2d 1108 (Ala.Civ.App. 1980) (life insurance policy).
Armstrong relies solely on Moore for the proposition that the negligence claim accrued when the policy lapsed rather than when an event which would trigger liability under the policy occurs. Moore clearly says just that. However, we believe thatMoore is incorrect in this regard. Moore reached that conclusion because that court believed "plaintiff lost a substantial interest as the named beneficiary in the proceeds of the policy" at the time the policy lapsed, was therefore damaged, and had a cause of action. Id. at 1111. The court inMoore acknowledged that it was unaware of any direct authority to support its conclusion, and referred only to the case ofMeyerson v. New Idea Hosiery Co., 217 Ala. 153, 115 So. 94
(1928). While Meyerson was factually similar, the Meyerson
Court had a wholly different rationale for holding that the plaintiff's negligence claim failed. The Court in Meyerson held that because the complaint only alleged negligence in failure to give notice to the insured before allowing the insurance to lapse, only the insured, not the plaintiff (beneficiary) had a cause of action.
The exact issue presented in this case has been addressed by courts in at least four other states. Austin v. Fulton Ins.Co., 444 P.2d 536 (Alaska 1968); Wulfswinkel v. Gesink,180 N.W.2d 452 (Iowa 1970); Spurlin v. Paul Brown Agency, Inc.,80 N.M. 306, 454 P.2d 963 (1969), Kunz v. Buckeye Union Ins. Co.,1 Ohio St.3d 79, 437 N.E.2d 1194 (1982). Each of these cases holds that the cause of action accrues when a loss triggering liability under the lapsed policy occurs. In Austin the Alaska Supreme Court said:
 "A tort is ordinarily not complete until there has been an invasion of a legally protected interest of the plaintiff. Appellant's interest was in being protected against earthquake loss. There was no invasion, or infringement upon or impairment of such interest until there had been a loss by earthquake, because until that event occurred such protection could avail appellant nothing. His interest, which is legally protected, was in having such protection when it was needed, at the time of the loss and not before. Thus, in a case like this there must be an injury or harm to appellant as a consequence of appellees' negligence to serve as a basis for recovery of damages before the tort became actionable and before the period of limitation commenced to run."
Austin, supra at 539.
We believe this to be the proper rule and overrule Moore to the extent it conflicts with our holding in this case. Therefore, plaintiff's negligence claims are not barred by the statute of limitations.
V. Is there a scintilla of evidence to support the Weninegars' allegations of negligence against MCS and L N?
Because there is a dispute as to whether the file and escrow fund were properly forwarded and as to whether the increase in escrow payments was due to the flood insurance premiums, the summary judgments on the negligence counts were improper.
VI. Is the Bank vicariously liable for negligence for the acts of MCS and L N? *Page 957 
The existence and scope of a principal-agent relationship is generally a question of fact for determination by the jury; therefore, summary judgment on the issue of agency is inappropriate. Oliver v. Taylor, 394 So.2d 945 (Ala. 1981).
VII. Is there a scintilla of evidence to support the Weninegars' allegations of fraud against the Bank, MCS, and L 
N?
The Weninegars failed to present a scintilla of evidence that there was an actual fraudulent intent not to perform all of the terms of the mortgage and an intent to deceive the Weninegars when the Bank entered into the mortgage agreement with them and when MCS and L N began servicing the mortgage. See, D.H.Holmes Dept. Store v. Feil, 472 So.2d 1001 (Ala. 1985); KennedyElec. Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala. 1983).
The claim of fraudulent concealment or suppression of facts is not subject to review, because it was not raised in the trial court. Green v. Taylor, 437 So.2d 1259 (Ala. 1983).
VIII. Is there a scintilla of evidence to support the Weninegars' allegation of fraud against S.S. Steele Company?
We do not decide whether there was a scintilla of evidence to support this fraud count, because the count was barred by the statute of limitations. The amendment alleging fraud against S.S. Steele Company did not relate back to the time of the original complaint under the fictitious party rule, because there was no cause of action for fraud stated against the fictitious parties in the complaint. Rule 9 (h), Ala.R.Civ.P.;Robinson v. Graves, 456 So.2d 793 (Ala. 1984); Denney v. Serio,446 So.2d 7 (Ala. 1984). In order to toll the running of the statute of limitations, a cause of action must be alleged in the complaint against the fictitious party. Robinson, supra,Minton v. Whisenant, 402 So.2d 971 (Ala. 1981). Finally, there is no relation back under the general relation-back provisions of Rule 15 (c), because there is no showing that S.S. Steele 
Company knew or should have known that a mistake in identity had been made and that it was the intended defendant on the fraud count.
The Weninegars cannot bootstrap the fraud count by linking it to the negligence count which may have, arguably, been filed in a timely manner, because the theories of recovery are completely different. The trial judge did not err in granting summary judgment in favor of S.S. Steele Company on the fraud count.
This case is hereby affirmed in part, reversed in part, and remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, FAULKNER, JONES, ALMON, SHORES and ADAMS, JJ., concur.