This is an appeal by plaintiff, Dr. John Langley, from an order granting summary judgment in favor of defendants, Mutual Fire, Marine and Inland Insurance Company ("Mutual Fire"); W.K.P. Wilson and Son, Inc.; and Mr. Pharr Hume. We affirm.
From August 9, 1977, through August 8, 1978, Dr. Langley's medical malpractice liability insurance carrier was Mutual Fire. *Page 754 
The policy issued to Dr. Langley by Mutual Fire was a "claims-made" insurance policy. The first sentence appearing in Dr. Langley's policy is a statement alerting the insured as to the nature of the "claims-made" type of policy; it provided as follows:
 "Claims Made Policy: Except to such extent as may be provided otherwise herein, this policy is limited to liability for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE. Please review the policy carefully."
Further down on the same page of the policy, under the section entitled "The Coverage," there appears another statement explaining the claims-made character of the policy:
 "Claims Made Clause: This policy applies to CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD arising out of malpractice committed or alleged to have been committed subsequent to the retroactive date set forth in the Declarations."
According to Dr. Langley, during the summer of 1978, W.K.P. Wilson Son, Inc., through its agent, Pharr Hume, contacted Dr. Langley and solicited his malpractice insurance business. Wilson Son and Hume, however, contend that they did not contact Dr. Langley until the fall of 1978. In any event, Dr. Langley did not renew his coverage with Mutual Fire, nor did he execute the optional extension of coverage offered by Mutual Fire that would have continued his coverage for three years for claims based on acts or omissions that occurred during the primary term of the Mutual Fire policy. This "optional extension period" is described at length on the second page of Dr. Langley's policy:
 "4. Optional Extension Period: In the event of the termination of this insurance by reason of non-renewal or cancellation by the Insured, or if the Company shall cancel this policy or terminate it by refusing to renew, then the Insured upon payment of an additional premium shall have the option to extend this policy, subject otherwise to its terms, limits of coverage, exclusions and conditions, to apply to claims first made against the insured during thirty-six calendar months following immediately upon the effective date of such cancellation or non-renewal, but only for such malpractice committed or alleged to have been committed between the retroactive date and the effective date or such cancellation or termination.
This interval shall be hereinafter referred to as the OPTIONAL EXTENSION PERIOD.
". . .
 "However, the Insured's right to purchase an optional extension period must be exercised by the Insured by notice in writing not later than forty-five days after the cancellation or termination date of this policy. If such notice is not given the Insured shall not at a later date be able to exercise such right.
 "The fact that the period during which claims may be first made under this policy is extended by virtue of the optional extension period shall not in any way increase the limits of liability set forth in the Declarations." (Emphasis added.)
Following Dr. Langley's non-renewal of his Mutual Fire policy, which was effective on August 9, 1978, he received the following letter from Mutual Fire concerning his option to extend his coverage in accordance with the above-quoted provision of his policy with Mutual Fire:
"CERTIFIED MAIL
"RETURN RECEIPT REQUESTED
"August 14, 1978
"John Olin Langley, MD
"John Olin Langley, MD, PC
"1701 Springhill Avenue
"Mobile, AL 36604
 "Re: Non-Renewal of Professional Liability Insurance for Physicians and Surgeons
 Insurer: The Mutual Fire, Marine Inland Insurance Company
Contract Number: MP 702567
Effective Date of Non-Renewal: August 9, 1978 *Page 755 
OPTION TO EXTEND THE CLAIMS REPORTING PERIOD
"Dear Dr. Langley:
 "We are hereby notifying you of your right in accordance with the terms and conditions of your contract to purchase the Optional Extension Period as defined in your contract under the Section entitled THE COVERAGE.
 "The premium for the three year Optional Extension Period is $8,833.00, plus any applicable tax.
 "The right to exercise the Optional Extension Period must be exercised by you in writing no later than forty-five (45) days following August 9, 1978 or ten (10) days from the date of this letter, whichever date is later. Please return your signed and dated response in the business envelope enclosed for your use.
"Sincerely,
"Carolyn J. Sayre
"CJS/jr
"cc: Mr. Alan Murray
 John Lloyd Co. PO Box 7503-A, Office Park Birmingham, AL 35223"
As previously noted, Dr. Langley did not exercise his option to purchase the extended coverage with Mutual Fire. Instead, on October 20, 1978, Dr. Langley applied for coverage through Wilson Son, the insurance to be underwritten by St. Paul Fire Marine Insurance Company ("St. Paul").
Dr. Langley contends that Hume represented to him that his insurance coverage would be continuous; that is, that there would be no lapse in coverage from the date of the changeover from the Mutual Fire policy to the St. Paul policy. Nevertheless, Dr. Langley's application for insurance through Wilson Son indicated that coverage would not be effective until October 24, 1978, the date on which Dr. Langley's policy was, in fact, issued. In other words, the retroactive date on Dr. Langley's St. Paul policy was October 24, 1978, and, therefore, the policy did not provide coverage for any period of time prior thereto. Indeed, because Dr. Langley's cancellation of his Mutual Fire policy was effective August 9, 1978, Dr. Langley was completely without coverage for the period between August 9 and October 24, 1978. Additionally, the St. Paul policy issued to Dr. Langley in October was also a claims-made type of policy.
Dr. Langley continued his malpractice coverage through Wilson Son until March 24, 1980, when Wilson Son cancelled the policy for nonpayment of premiums. Dr. Langley also subsequently declined to purchase an optional "Reporting Endorsement" from St. Paul, which would have offered him the same type of benefit as the optional extension of coverage that had been offered Langley by Mutual Fire. Under the terms of the St. Paul policy and the reporting endorsement offered to Dr. Langley by St. Paul, that endorsement would have covered Dr. Langley on a continuous basis for injuries or deaths occurring during the policy period (October 24, 1978, through March 24, 1980) without regard to when the claim was made.
In February 1983, a medical malpractice claim was filed against Dr. Langley alleging negligence in the delivery of a child on July 9, 1978, which negligence resulted in the severe and permanent brain damage of the child. Dr. Langley first notified Wilson Son of the claim, but it declined to defend, responding that Mutual Fire was Dr. Langley's insurer on the date of the alleged negligent delivery. Mutual Fire, however, also refused to defend because the policy under which Dr. Langley had been insured was expressly "limited to liability for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDWHILE THE POLICY IS IN FORCE." (Emphasis added.) Further, Dr. Langley had declined to purchase the optional extension of coverage at the time he cancelled his policy with Mutual Fire. Dr. Langley filed this action on January 9, 1984, naming as defendants Mutual Fire; Wilson Son; and Pharr Hume, individually.
In the interest of clarity and convenience, the above narrative of pertinent events is set out below in chronological fashion:
 August 9, 1977 Effective date of Dr. Langley's claims-made policy with Mutual Fire. *Page 756 
 July 9, 1978 Date of alleged medical malpractice by Dr. Langley.
 August 9, 1978 Mutual Fire policy cancelled (non-renewed).
 August 14, 1978 Mutual Fire's letter to Dr. Langley notifying him of his option to purchase extension contract.
 October 20, 1978 Date of Dr. Langley's application for coverage through Wilson Son.
 October 24, 1978 Effective date of Dr. Langley's claims-made policy with St. Paul.
 March 24, 1982 St. Paul policy cancelled for nonpayment of premiums.
 February 1983 Medical malpractice action filed against Dr. Langley for alleged negligence on July 9, 1978.
 January 9, 1984 Langley's fraud, negligence, and breach of contract action filed against Mutual Fire, Pharr Hume, and Wilson Son.
By his initial complaint, Dr. Langley's claim against Mutual Fire alleged breach of contract, and his claims against Pharr Hume and Wilson Son alleged misrepresentation and negligent design and structuring of his insurance coverage. Discovery ensued, and then, together, Wilson Son and Hume moved for summary judgment, as did Mutual Fire. The trial court granted defendants' motions by separate orders entered August 13, 1985. Dr. Langley subsequently sought to amend his complaint on September 11, 1985, to allege a breach of contract claim against Wilson Son and Pharr Hume. The same day, Dr. Langley also filed a motion to reconsider. The trial court granted both motions and set aside the summary judgment entered August 13, 1985. Wilson Son and Hume moved to strike the amended complaint, but that motion was denied. Subsequently, on October 31, 1985, all defendants again moved for summary judgment as to the allegations of plaintiff's complaint and amended complaint. The trial court granted defendants' motions for summary judgment "against Plaintiff John Langley on Plaintiff's amended complaint." This appeal followed.
 I. Summary Judgment for Mutual Fire.
Dr. Langley advances two arguments that he contends preclude summary judgment in favor of Mutual Fire. First, he contends that there is some ambiguity in the wording of the Mutual Fire policy, leaving a question of fact for a jury to resolve. We disagree. The claims-made character of Dr. Langley's Mutual Fire policy is made readily apparent within the policy itself. As set out in the beginning of this opinion, the first sentence
of the policy alerts the insured that the policy is a claims-made policy limiting coverage to "only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS INFORCE." (Emphasis added.) The insured is then cautioned to "review the policy carefully." Further down on the same page, the claims made clause appears and "claims made" is again defined with more specificity: "This policy applies to CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD arising out of malpractice committed or alleged to have been committed subsequent to the retroactive date set forth in the Declarations." We find this language to be abundantly clear and free from ambiguity. The portion of the policy describing the "Optional Extension Period" (quoted supra), which was expressly offered to Dr. Langley when he notified Mutual Fire of his decision not to renew his coverage, further clarifies the claims-made nature of the policy: If the policy provided coverage for claims that arose during the policy period, but which were not made until after the policy period had expired, what need would there be for an optional extension period as defined in the policy?
Whether a written contract is ambiguous and unclear is a question of law for the court. Upton v. Mississippi ValleyTitle Ins. Co., 469 So.2d 548 (Ala. 1985); Smiths WaterAuthority v. City of Phenix City, 436 So.2d 827 (Ala. 1983). If an insurance contract is deemed to be unambiguous, we must apply its terms and enforce the contract as written. Upton v.Mississippi Valley Title Ins. Co., supra; Turner v. UnitedStates Fidelity Guaranty Co., 440 So.2d 1026 (Ala. 1983).
 "We cannot defeat the express provisions of a policy, including any exclusion, by making a new contract for the parties. Turner, supra. This Court has consistently recognized that
 " ' "In the absence of statutory provisions to the contrary, insurance companies have the same right as individuals *Page 757 
to limit their liability, and to impose whatever conditions they please upon their obligations not inconsistent with public policy; and the courts have no right to add anything to their contracts or to take anything from them." ' Life and Casualty Ins. Co. v. Whitehurst, 226 Ala. 687, 148 So. 164 (1933)."
Upton, supra, 469 So.2d at 554. (Emphasis added.)
Having concluded that the claims-made clause of the Mutual Fire policy is clear and unambiguous, we next address Dr. Langley's second contention: that public policy dictates that this claims-made clause be declared null and void, and that, under the circumstances of this case, Mutual Fire should be required to extend coverage. Dr. Langley cites this Court primarily to three Alabama cases that he believes have a direct bearing on the public policy issue presented by this case. The "trilogy" of cases he cites are Utica Mutual Ins. Co. v.Tuscaloosa Motor Co., 295 Ala. 309, 329 So.2d 82 (1976); WixomBrothers Co. v. Truck Ins. Exchange, 435 So.2d 1231 (Ala. 1983); and U.S.F. G. Ins. Co. v. Warwick Development Co.,446 So.2d 1021 (Ala. 1985). Dr. Langley contends that because of the wording of the insurance contracts in this case, he has been put into the situation about which Justices Jones and Shores expressed concern in their separate opinions in Utica MutualIns. Co. and Warwick Development Co.:
 "[W]e were concerned that successive policies, by varying definitions of 'occurrence,' could leave an insured, who thought he had continuing coverage, without protection under either policy."
Warwick, 446 So.2d at 1026, Justices Jones and Shores concurring specially. We find these cases inapposite. In all three cases, in issue were "occurrence" policies of insurance as opposed to "claims-made" policies. Furthermore, in each case, the issue of coverage arose out of situations in which the commission of the alleged negligent act did not coincide with the injury or damage resulting therefrom, and the occurrence policy in force at the time of the alleged negligent act was not in force at the time of the injury or damage.
In Utica Mutual Ins. Co., supra, construing a policy provision defining "occurrence" as "an accident * * * which results, during the policy period, in bodily injury or property damage," a majority of the Court held that under the clear meaning of the policy language, "coverage is afforded only when bodily injury, or damage to or loss of property is suffered during the policy period irrespective of when the negligent act was performed which later resulted in such bodily injury, or damage to or loss of property." 295 Ala. at 313,329 So.2d at 85.
Later, in Wixom Brothers Co., supra, faced with the identical issue, a majority of the Court adopted the language and reasoning of the dissenting Justices in Utica Mutual Ins. Co., and held that, although, in unambiguous terms, the insurer had "limited its risk of loss by definition of the term 'occurrence' to the extent set out above," the enforcement of such a coverage restriction offends the public policy of this state. Wixom Brothers Co., 435 So.2d at 1234.
Less than one year later, this Court decided WarwickDevelopment Co., supra, and in a plurality opinion, we abandoned the holding in Wixom Brothers Co. and adopted the view that, under an "occurrence" policy, the time of an "occurrence" of an accident is not the time the wrongful act was committed, but rather it is when the complaining party was actually damaged. The USF G policy in Warwick Development Co.
defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." 446 So.2d at 1023. "Property damage" was defined in the USF G policy as:
 "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or *Page 758 
 "(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
Thus, in Warwick Development Co., this Court upheld the policy definitions that, in effect, limited the insurer's risk of loss. We do no more than this in the case at bar.
We, therefore, think that, in James Hackworth v.Continental Casualty Co., 522 F. Supp. 785 (N.D.Ala. 1980), Judge Grooms correctly concluded that the claims-made type of insurance policy is not void as against the public policy of this state, thereby rejecting the argument that such policies should be treated as occurrence policies:
 "The policy contains a provision designated III(b) reading:
 " 'The insurance afforded by this policy applies to errors, omissions or negligent acts which occur on or after the date stated in item 6 of the declarations (the effective date of the first policy issued and continuously renewed by the Company) provided that claim therefor is first made against the insured during this policy period and reported in writing to the Company during this policy period or within 60 days after the expiration of this policy period.'
". . .
 "Plaintiffs contend . . . [this] so-called 'claims made' policy provision is void as against public policy and should be treated as an occurrence policy provision.
". . .
 "Without resort to an analysis of the various decisions [cited by the parties], the Court is of the opinion that III(b) of the policy renders this a 'claims-made' or 'discovery' type of policy rather than an 'occurrence' policy, and that the provision is not contrary to the public policy of the state. This conclusion is buttressed by the rationale of the holding in Utica Mutual, supra. In that case the policy covered 'bodily injury, property damage, or loss, which occurred during the policy period.' Negligent repair to an automobile, which resulted in an accident causing the property damage, was made during the policy period. The accident occurred after the policy period. The court held that the policy would be enforced as written, stating that:
 " 'The clear meaning of the policy language is that coverage is afforded only when bodily injury, or damage to or loss of property is suffered during the policy period irrespective of when the negligent act was performed which later resulted in such bodily injury, or damage to or loss of property.'
 "With respect to public policy, in the Court's opinion this conclusion neither contravenes Section 27-23-2 of Alabama Code of 1975, nor Section 6-2-15 prohibiting the shortening of the statutes of limitation."
(Footnotes omitted.) 522 F. Supp. 786-87.
Dr. Langley, nevertheless, argues in his brief that insurance companies should not be allowed to write contracts in such a manner so as to avoid their obligations, in situations such as the present, by including a phrase in the contract requiring that claims be presented or made during the policy period
before such claims will be paid or defended. However, Dr. Langley cites no authority consistent with this argument regarding claims-made policies. Indeed, it appears that a decided majority of courts that have considered this argument have gone the other way. See cases discussed at Annot., 37 A.L.R.4th 382, 457-67 (1985). In most of those cases where it has been held that coverage should be provided, the decisions are based on the courts' findings that the following policy language is ambiguous because of the words "which may be made": "The company shall indemnify insured against any claim or claims for breach of professional duty which may be madeagainst them during the policy period." Id. at 457-59. As previously discussed, the policy language in question in this case is not at all like the above language, and is, in fact, quite clear and its meaning readily apparent regarding the claims-made character of the policy. *Page 759 
In only two of the cases cited at 37 A.L.R.4th, at 459-60, was it held that certain provisions of the claims-made policies in question were violative of public policy. In Jones v.Continental Casualty Co., 123 N.J. Super. 353, 303 A.2d 91
(1973) (cited in James Hackworth v. Continental Cas. Co.,supra), Continental Casualty had provided professional liability coverage for the plaintiff from 1965 through 1970, when that coverage was discontinued. Thereafter, on August 18, 1971, plaintiff received notice of a claim made against him for work he had performed in 1966. Plaintiff promptly notified Continental Casualty of the claim. After an initial investigation, Continental denied coverage, and plaintiff filed suit against Continental. The court held that the period of coverage (specifically the retroactive coverage), as defined in the insurance policy, violated public policy in that these policy provisions (set out below) inhibited freedom of contract:
"IV. Policy Period, Territory.
 "(a) During the Policy Period. The insurance afforded by this policy applies to errors, omissions or negligent acts which occur * * * during this policy period if claim therefor is first made against the insured during this policy period.
 "(b) Prior to the Policy Period. The insurance afforded by this policy also applies to errors, omissions or negligent acts which occur within the United States of America, * * * prior to the effective date of this policy if claim therefor is first made against the insured during this policy period and if all of the following requirements are present:
 "(1) the error, omission, or negligent act was also insured by this Company under the prior policy
(as defined below) * * *
 "(2) no insured, at the effective date of the prior policy (as defined below), had any knowledge of a pending claim which might be made against any insured or had knowledge or any circumstance which may reasonably be expected to create a claim against any insured.
 "Prior policy (for the purpose of this insuring agreement) means the combined total of all architects' and/or engineers' professional liability policies issued by this Company beginning with the first architects' and/or engineers' professional liability policy followed continuously by successive architects' and/or engineers' professional liability policies, the last of which expired on the effective date of this policy."
303 A.2d at 92-93. (Emphasis added.)
In holding that public policy had been violated, the New Jersey Court reasoned as follows:
 "In order for plaintiff to maintain coverage or have continuity of coverage, he must continue to have defendant as the insurance carrier. Such provisions do inhibit freedom of action in this field.
". . .
 "No cases have been cited by defendant in support of its position where retroactive coverage was limited, as in this case, to prior coverage by the same insurer and where the coverage ceased upon the termination of the policy period.
". . .
 "Nowhere has the change in public policy in connection with claims been more noticeable in recent years than in the approach of our Supreme Court to the statute of limitations in the field of professional liability. . . .
 "Public policy in this regard is . . . clearly expressed in the judicial decisions (Allen v. Commercial Casualty, supra, 131 N.J.L. at 478, 37 A.2d 37) in favor of extending time for making claim or bringing suit for a wrong in the professional liability field. When comparing this clearly expressed public policy with the insurance policy before us, we find that the insurance policy provides for severely limited retroactivity and no prospective coverage for claims made after the expiration of the policy period. This limited coverage is clearly against public policy as it has been developed in this area in recent years by the decisions of our Supreme Court."
(Emphasis added.) 303 A.2d at 95-97.
The claims-made insurance contract in the present case does not purport to provide *Page 760 
retroactive coverage at all beyond the retroactive date of the policy, regardless of whether the insured's previous coverage was with Mutual Fire. Thus, there is no freedom of contract violation in this case. Furthermore, prospective coverage for claims made after the expiration of the policy period, which is really the critical coverage under these facts, was provided to the insured in this case at his option under the "Optional Extension Period" provision of the policy. This option was offered to Dr. Langley, but he rejected it.
The second case discussed at 37 A.L.R.4th, at 459-60, isHeen Flint Associates v. Travelers Indemnity Co., 93 Misc.2d 1,400 N.Y.S.2d 994 (S.Ct. 1977). In that case, the Court rejected the insured's argument that the condition of claims-made policies excluding coverage for events occurring within the policy period when claims are not made therefor until after the policy period is void as being against public policy. The Court discussed Jones v. Continental Casualty Co.,supra, but followed the majority rule:
 "Expressly rejecting this [public policy] contention are: Rotwein v. General Accident Group, 103 N.J. Super. 406, 247 A.2d 370, supra; Livingston Parish School Bd. v. Fireman's Fund American Insurance Co. (La.), 282 So.2d 478; Lehr v. Professional Underwriters, 296 Mich. 693, 296 N.W. 843; Oceanonics, Inc. v. Petroleum Distributing Co. (La.), 292 So.2d 190.
". . .
 "The public policy argument is that 'claims made' policies restrict the freedom of contract by tying the insured to one insurer in order to maintain continuous coverage. In rejecting this argument the courts have held that retroactive coverage was available so that an insured might have obtained a new policy from another insurer which would insure him for claims made during the period of the new policy for errors or omissions committed prior thereto. (See Rotwein v. General Accident Group, 247 A.2d p. 376, supra; Oceanonics, Inc. v. Petroleum Distributing Co., p. 192, supra;
and Livingston Parish School Bd. v. Fireman's Fund American Insurance Co., pp. 481-483, supra).
 "Upholding the public policy argument is Jones v. Continental Casualty Co., 123 N.J. Super. 353, 359, 303 A.2d 91, 94. There, the policy provisions were similar to those in the Travelers policy and the court held that the condition limiting coverage to claims made during the policy period was against public policy and void. The court reasoned, 'In this case, clearly the policy provisions in effect inhibit freedom of contract. In order for plaintiff to maintain coverage or have continuity of coverage, he must continue to have defendant as the insurance carrier. Such provisions do inhibit freedom of action in this field.'
 "While 'claims made' policies do tend to inhibit an insured from changing carriers for fear he will lose coverage, it does appear that retroactive coverage is available where the insured is not aware, at the time he applies for and obtains a new policy, of any particular circumstances that may lead to a claim against him. I agree with the majority of the cases and decline to hold 'claims made' provisions void solely because they may tend to inhibit the freedom of contract."
400 N.Y.S.2d at 997. The court in Heen Flint Associates did go on to hold that a claims-made policy provision, permitting an insurer having notice of a potential claim to refuse to renew that policy, is unconscionable:
 "A second argument against 'claims made' policies is that of unconscionability. None of the cases have held 'claims made' [provisions] of professional liability insurance policies to be unconscionable. In no other case, however, did the insurance company refuse to renew its policy after the company had notice of a potential claim and in all of the cases upholding the validity of 'claims made' policies, the insured could have obtained coverage against claims made after the policy period, either by renewing his policy with the same insurer or by purchasing retroactive coverage with another company. *Page 761 
". . .
 "It is my determination that a provision in a 'claims made' policy that permits an insurer, where it has notice of a potential claim, to refuse to renew that policy, is unconscionable. Such a provision allows an insurer to avoid the risk of serious potential claims arising from accidents committed within the policy period, and leaves the insured without coverage after the expiration of the policy, since no other insurer will be willing to accept the known risk and thus buy its way into a potential lawsuit."
(Emphasis added.) 400 N.Y.S.2d at 997-99.
But we are not presented with such a provision in the present case, nor with circumstances wherein Mutual Fire refused to renew Langley's coverage because it was made aware of a potential claim. In this case, Dr. Langley chose not to renew his policy with Mutual Fire and declined to exercise his option under that policy to purchase from Mutual Fire an extension of coverage policy.
We agree with and adopt the reasoning and analysis of the Supreme Court of Florida in Gulf Insurance Co. v. Dolan,Fertig, Curtis, 433 So.2d 512 (Fla. 1983), a case factually similar to the present case. In Gulf Insurance Co., Dolan (a law firm) chose not to renew its professional liability claims-made insurance policy with Gulf Insurance Company ("Gulf"), but instead contracted with Lawyers Professional Liability Insurance Company ("LPLIC") for a claims-made policy effective for the period November 20, 1979, to November 20, 1980. On November 19, 1979, the last day the Gulf policy was in effect, Dolan received notice of a potential malpractice claim. Dolan first notified LPLIC of this claim on December 6, 1979, but LPLIC denied coverage because Dolan learned of the claim prior to the effective date of the LPLIC policy. Later, on February 12, 1980, Dolan notified Gulf of the claim; Gulf also denied coverage because it was not notified during the policy period as expressly required by the Gulf policy.
After the claimant obtained a $50,000 judgment against Dolan, Dolan filed a declaratory judgment action against Gulf and LPLIC seeking a determination as to whether either or both were liable for the damages award. Gulf and LPLIC moved for summary judgment: Gulf's motion was granted and LPLIC's motion was denied. Dolan appealed the summary judgment in favor of Gulf. The Fourth District Court of Appeals reversed the summary judgment, holding that, while claims-made policies were not against public policy, nevertheless, in order to make the contract fair, there should be a reasonable time after the policy period expires for reporting claims that are discovered late in the policy period. Dolan, Fertig Curtis v. GulfInsurance Co., 419 So.2d 1108 (Fla.Dist.Ct.App. 1982). On rehearing, the district court certified to the Florida Supreme Court the issue of whether a court can "engraft upon an unambiguous claims-made insurance policy a reasonable additional period of time after the policy period expires for reporting claims that arise late in the contract term." GulfInsurance Co., supra, 433 So.2d at 513. The Florida Supreme Court answered the question in the negative and quashed the district court's opinion. In its analysis, the court compared claims-made policies to occurrence policies, describing particularly the notice requirements of each:
 "Both claims-made and occurrence policies generally have provisions written into the contract that require, as a condition of the policy, that the insured give notice of the claim to the insurance carrier 'immediately,' 'promptly,' 'as soon as practicable,' or 'within a reasonable time.' See American Fire Casualty Co. v. Collura, 163 So.2d 784 (Fla. 2d DCA), cert. denied, 171 So.2d 389 (Fla. 1964). This is bottomed on the premise of prejudice to the insurer who, because of a client's delayed notice to it, has, for example, lost the opportunity of making a timely investigation, forming an estimate of its rights and liabilities, or preventing fraud upon it. 7 Am.Jur.2d Automobile Insurance § 369 (1980).
 "Notice within an occurrence policy is not the critical and distinguishing feature of that policy type. Occurrence policies are built around an insurer who is liable *Page 762 
for the insured's malpractice, no matter when discovered, so long as the malpractice occurred within the time confines of the policy period. Coverage depends on when the negligent act or omission occurred and not when the claim was asserted. The occurrence insurer, then, is faced with a 'tail' that extends beyond the policy period itself. This 'tail' is the lapse of time between the date of the error (within the policy period) and the time when a claim is made against the insured. The giving of notice is only a condition of the policy, and in no manner is it an extension of coverage itself. It does not matter when the insurer is notified of the claim by the insured, so long as the notification is within a reasonable time and so long as the negligent act or omission occurred within the policy period itself.
 "Claims-made policies, likewise, require that notification to the insurer be within a reasonable time. Critically, however, claims-made policies require that that notice be given during the policy period itself. [Emphasis in original.] When an insured becomes aware of any event that could result in liability, then it must give notice to the insurer, and that notice must be given 'within a reasonable time' or 'as soon as practicable' — at all times, however, during the policy period."
433 So.2d at 515. The Florida court went on to explain that, in view of the differences between the notice provisions of the two types of policies, courts cannot, in effect, extend the coverage of claims-made policies by gratuitously adding an occurrence-policy type "tail":
 "With claims-made policies, the very act of giving an extension of reporting time after the expiration of the policy period, as the district court proposes, negates the inherent difference between the two contract types. Coverage depends on the claim being made and reported to the insurer during the policy period. Claims-made or discovery policies are essentially reporting policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches. If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an extension of coverage to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties. This we cannot and will not do. [Emphasis added in Gulf Insurance Co.]
"As one commentator has noted:
 " 'An underwriter who is secure in the fact that claims will not arise under the subject policy . . . after its termination or expiration can underwrite a risk and compute premiums with greater certainty. The insurer can establish his reserves without having to consider the possibilities of inflation beyond the policy period, upwardspiralling jury awards, or later changes in the definition and application of negligence.
 Kroll ["The 'Claims Made' Dilemma in Professional Liability Insurance," 22 U.C.L.A.L.Rev. 925 (1975),] at 928 (footnote omitted). This theoretically results in lower premiums for an insured since there is no open-ended 'tail' after the expiration date of the policy. In fact, there can be no 'tail' unless, of course, an extended reporting period is written into the claims-made policy itself. Some claims-made policies do provide that claims made against the insured during the policy period may be reported to the insurer during a specified period after the end of the policy period. See James Hackworth v. Continental Casualty Co., 522 F. Supp. 785
(N.D.Ala. 1980) (60 days specified in the policy); Graman v. Continental Casualty Co. (60 days specified in the policy); Troy Stalder Co. v. Continental Casualty Co., 206 Neb. 28, 290 N.W.2d 809 (1980) (60 days specified in the policy); Gereboff v. Home Indemnity Co. (one year specified in the policy). The liability policy in this case *Page 763 
did not so provide. However, it contained a provision which gave the insured, in consideration of an additional premium, the right, which need be exercised by written notice not later than 30 days after the termination date of the policy, to have issued an endorsement providing an extended discovery period within which claims otherwise covered by the policy may be reported to the insurer after the end of the policy period. This extended discovery endorsement would thus have permitted Dolan to report the claim in question to Gulf at a point in time after the termination date of the policy period. Dolan, however, declined to avail itself of this quasi-'tail' provision. '[T]he insured received what [it] paid for by the present policy, with premiums presumably reduced to reflect the limited coverage.' Livingston Parish School Board, 282 So.2d at 483. Dolan cannot now be heard to complaint."
(Footnotes omitted.) (Emphasis added.) 433 So.2d 515-16. Just as in Gulf Insurance Co., supra, the insured in this case "declined to avail" himself of the extended discovery endorsement offered by Mutual Fire.
Dr. Langley, nevertheless, argues in his brief that none of the options available to him (short of renewing his policy with Mutual Fire) "would have changed the outcome of this case one iota." He contends that "the corrective measure by way of a reporting endorsement, reporting extension, tail provision, or [by] any other name . . . does not allow the plaintiff in this situation any means whatsoever to protect himself against acts which may have occurred during the duration of his insurance with Mutual Fire which could possibly leave him subject to legal liability." The reference in this statement is apparently to the fact that the extended endorsement offered by Mutual Fire extended the period for making claims for only up to three years beyond the date the policy was cancelled or nonrenewed, whereas the malpractice claim made against Dr. Langley in this case was filed four and one-half years after the effective date of Dr. Langley's non-renewal of the Mutual Fire policy. In other words, Dr. Langley contends that even if he had purchased the extension of coverage endorsement offered him he still would be without coverage for this claim. We hold, however, that because Dr. Langley elected not to purchase the three-year optional extension of coverage contract, he has no standing to argue that this extension of coverage contract is so inadequate as to make it invalid and violative of public policy. Moreover, Dr. Langley offered no evidence that this optional extension contract would not have been renewed.
If the optional extension contract offered to Dr. Langley by Mutual Fire could have been renewed for additional three-year periods of coverage, Dr. Langley could have so renewed in order to keep his extended coverage in effect long enough for the statute of limitations to run on all potential medical malpractice claims arising from his acts or omissions during the primary policy period, which was August 9, 1977, through August 8, 1978. Under § 6-5-482, Code of 1975, an adult patient/plaintiff has, at the outside, four years "next after the act or omission or failure giving rise to the claim" in which to bring an action thereon. In the case of a minor patient/plaintiff "under four years of age, such minor shall have until his eighth birthday to commence such an action." Thus, Dr. Langley, whose practice included obstetrics, would have needed to extend his coverage period for making claims for at least eight years after the date, within the primary policy term, he last performed medical services injurious to a newborn child. Dr. Langley however, did not even chose to avail himself of the three-year extension contract offered by Mutual Fire, nor has he shown that that contract was nonrenewable. For these reasons, we shall not consider his contentions that the optional extension contract offered him did not afford him any protection whatsoever.
We, therefore, hold that summary judgment in favor of Mutual Fire was proper.
 II.
The next issue concerns the propriety of summary judgment in favor of defendants *Page 764 
Pharr Hume and Wilson Son on Dr. Langley's claims for misrepresentation and negligent structure and design of insurance coverage. We agree with defendants that these claims are barred by the applicable one-year statute of limitations, Code of 1975, § 6-2-39.[1]
 A. Misrepresentation.
Dr. Langley claims that defendants Hume and Wilson represented their own intention to provide a professional liability policy that "would be virtually the same as the old coverage, . . . would be such a smooth changeover that Plaintiff wouldn't even know the difference, and . . . would [permit] no lapse in coverage." It is undisputed that, following these alleged misrepresentations, Dr. Langley filled out an application showing the effective date and nature of coverage (claims-made) applied for; he received the claims-made policy itself; he received a renewal notice showing the effective date and nature of coverage; he received a letter from Hume showing the effective date and nature of coverage; and St. Paul wrote Dr. Langley a letter specifically advising him of the nature of a claims-made policy. The date of the last of the series of these notices was July 24, 1980.
The issue under these facts is whether Dr. Langley filed this action for fraudulent misrepresentation within one year after he reasonably should have discovered the fraud. See Code of 1975, § 6-2-3. Fraud is deemed to have been discovered at the time of the discovery of facts which would provoke inquiry by a person of ordinary prudence, and which, if followed up, would have led to the discovery of the fraud.
Under the facts of this case, it is clear that, as a matter of law, Dr. Langley should have discovered the alleged misrepresentation within the year after he received a copy of his St. Paul policy and other documents reflecting the effective date of coverage for that policy. Sharpe v. CrookRealty Co., 508 So.2d 262 (Ala. 1987); Gonzales v. U-J ChevroletCo., 451 So.2d 244 (Ala. 1984); Torres v. State Farm Fire Casualty Co., 438 So.2d 757 (Ala. 1983); Sexton v. LibertyNational Life Ins. Co., 405 So.2d 18 (Ala. 1981); Seybold v.Magnolia Land Co., 376 So.2d 1083 (Ala. 1979). See also Myers v.Geneva Life Ins. Co., 495 So.2d 532 (Ala. 1986).
 B. Negligence.
The timeliness of Dr. Langley's claim for negligent structuring and design of coverage presents a more troublesome statute of limitations issue.
Dr. Langley alleged that "Defendants were negligent in designing and structuring this insurance coverage in failing to advise the plaintiff of the possibility of the lapse in coverage and in failing to advise the plaintiff that he should purchase prior acts coverage or a reporting endorsement which would remedy the lapse in coverage." At the outset, we note that, in support of their motion for summary judgment, defendants did not adduce evidence to contradict this allegation by Dr. Langley. They did, however, affirmatively plead the statute of limitations as a bar to recovery. The troublesome, yet pivotal, question to be decided under these facts and the pertinent authorities is the point at which Dr. Langley was damaged or legally injured as a result of the defendants' alleged negligence. Stated differently, when did Dr. Langley's cause of action for negligence accrue and the statute of limitations on that claim thereby begin to run?
In Armstrong v. Life Ins. Co. of Virginia, 454 So.2d 1377,1379 (Ala. 1984), this Court held that as to their claim for negligent failure to procure insurance, plaintiffs "suffered legal injury on the date Virginia Life failed to provide a policy in accordance with their expectations." In reaching that conclusion, this Court relied on Home Ins. Co. v.Stuart-McCorkle, Inc., 291 Ala. 601, 285 So.2d 468 (1973), for the general rule that "[a] negligence cause of action accrues *Page 765 
as soon as the plaintiff is entitled to maintain an action, regardless of whether the full amount of damages is apparent at the time of the first legal injury." 454 So.2d at 1379. To the facts in Armstrong, supra, we also analogized the case of Moorev. United States Pipe Foundry Co., 384 So.2d 1108
(Ala.Civ.App. 1980), in which the Court of Civil Appeals held that a cause of action for negligence in allowing a life insurance policy to lapse accrued on the date the policy lapsed, rather than the date of the insured's death. Moore was subsequently overruled by this Court in Weninegar v. S.S. Steele Co.,477 So.2d 949 (Ala. 1985), a case involving a claim for negligence in allowing a flood insurance policy to lapse. In Weninegar, this Court, following a line of authority from other jurisdictions, particularly Austin v. Fulton Ins. Co.,444 P.2d 536 (Alaska 1968), adopted the rule that a cause of action for negligent lapse accrues "when a loss triggering liability under the lapsed policy occurs." Weninegar, supra, 477 So.2d at 956. The Alaska court in its decision in Austin reasoned that, because the insured's legally protected interest is in being protected against a loss which the insurance was intended to cover, there can be "no invasion, or infringement upon or impairment of such interest until there had been [such] a loss . . ., because until that event occurred such protection couldavail the [insured] nothing." (Emphasis added.) Austin, supra, 444 P.2d 539. It is precisely this latter point (viz., what the insured is availed of) that causes this case, on its facts, to be distinguishable from Weninegar and the authorities on which it relies.
In the present case, Dr. Langley claims, in effect, that the defendants were negligent in failing to structure or design his coverage so that he would be covered for any acts of negligencethat he had already committed prior to the time he cancelled his claims-made policy with Mutual Fire. The malpractice action brought against Dr. Langley, for which he now seeks coverage, was for negligence alleged in the delivery of a child on July 9, 1978, which was during the Mutual Fire policy period, and prior to Dr. Langley's dealings with the defendants. Thus, Dr.Langley's legally protected interest was in being insured notmerely for future negligent acts that might result inliability, but especially for those negligent acts that he mayhave committed prior to the effective date of his St. Paulpolicy. In other words, Dr. Langley was supposed to be availed of something, i.e., coverage for prior negligent acts, on the date the policy was issued. Therefore, the fact that the insurance coverage Hume and Wilson Son structured for Dr. Langley did not accord with his expectations in this case onthe date that coverage was issued was clearly injurious to Dr. Langley because being without coverage for any prior negligent acts exposed him to a greater quantum of risk than the plaintiffs were exposed to in Weninegar prior to the occurrence of a flood. When the St. Paul policy was issued to Dr. Langley without providing the coverage Dr. Langley claims the defendants were under a duty to procure for him, Dr. Langley was thereby quantifiably injured, because he was then exposed to liability for malpractice claims that had already accrued.
Under these facts, we hold that the moment the defendants issued Dr. Langley a policy that failed to provide coverage for his prior negligent acts, his legally protected interest in having such coverage was palpably invaded, infringed upon, or impaired. Austin, supra. Accordingly, on that date, October 20, 1978, Dr. Langley's cause of action for negligence accrued and the applicable one-year statute of limitations began to run. Furthermore, absent any fraudulent concealment by the defendants, the plaintiff's ignorance of the tort or injury does not postpone the running of the statute until the tort or injury is discovered.[2] Kelly v. Shropshire, 199 Ala. 602,75 So. 291, 292 (1917). Because Dr. Langley's *Page 766 
negligence claim was not asserted within one year from the date his St. Paul policy was procured by the defendants, that claim is also time barred.
 III.
In addition to his claim alleging negligence, Dr. Langley asserted a breach of contract claim against defendants Pharr Hume and Wilson Son, which the defendants also failed to controvert by their motion for summary judgment. Nevertheless, summary judgment as to Dr. Langley's breach of contract claim is due to be affirmed under the merger doctrine.
In his amended complaint, Dr. langley alleged the following:
 "The plaintiff and the defendants W.K.P. Wilson Son, Inc., and Pharr Hume had an agreement whereby the plaintiff agreed to place his insurance coverages with the defendants and the defendants promised to structure the plaintiff's medical malpractice coverage so that there would be no lapse in coverage.
 "The plaintiff did in fact place his insurance coverages with the defendant.
 "The defendants breached their agreement by structuring the plaintiff's medical malpractice coverage in such a fashion as to result in a lapse in coverage."
In Sexton v. Liberty National Ins. Co., 405 So.2d 18, 22
(Ala. 1981), this Court reiterated and applied the merger doctrine to the facts of that case:
 "In Smith v. Protective Life Insurance Company, 355 So.2d 728 (Ala.Civ.App. 1978), the Alabama Court of Civil Appeals followed this court's decision in Hartford Fire Insurance Company v. Shapiro, 270 Ala. 149, 117 So.2d 348 (1960), when it said:
 " 'It is the rule that if the policy is accepted by the insured, he is bound thereby even though the policy does not correspond to the preliminary negotiations. The oral negotiations for the policy are merged in the accepted policy.'
"Smith, at 730.
 "This principle is well embedded in our law. Vrendenburg v. Liberty Nat. Life Ins. Co., 246 Ala. 251, 20 So.2d 207 (1944); Mutual Life Ins. Co. of New York v. Barrett, 215 Ala. 142, 110 So. 275
(1926); Georgia Home Insurance Co. v. Warten, 113 Ala. 479, 22 So. 288 (1897); Metropolitan Life Ins. Co. v. Goodman, 10 Ala. App. 446, 65 So. 449 (1914). . . .
 "The facts in this case do not support such an independent promise. Therefore, we are compelled to conclude that summary judgment was appropriate on Count IV for breach of oral contract. Mrs. Sexton received the policy calling for less than 80% payment of expenses and has not introduced sufficient evidence to overcome the presumption that she knew the terms of the contract."
Accord, Sharpe v. Crook Realty Co., supra. We hold that Sexton,supra, is directly applicable and controlling authority as to the agreement to insure alleged in the present case. For that reason, summary judgment in favor of defendants on Dr. Langley's breach of contract claim is due to be affirmed.
Based on the foregoing, summary judgment in favor of all defendants is due to be, and it is hereby, affirmed.
AFFIRMED.
MADDOX, JONES, ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
[1] After this lawsuit was filed, § 6-2-39 was repealed, effective January 9, 1985. The actions governed by the one-year provision of § 6-2-39 were transferred to § 6-2-38 and are now governed by that section's two-year limitations provisions. See Act 85-39, 1984-85 Alabama Acts, Second Special Session.
[2] As discussed in the first and second portions of this opinion, both of the claims-made policies issued to Dr. Langley were clear and unambiguous both as to the nature and as to the duration of the coverage provided. Had he read them carefully, Dr. Langley could have readily discovered the "lapse" in his coverage.