This case involves the question of whether St. Paul Fire 
Marine Insurance Company must defend and pay certain malpractice claims against Edge Memorial Hospital and Holy Name of Jesus Medical Center under the terms and conditions of an expired malpractice policy issued by St. Paul. A second issue concerns whether St. Paul is entitled to collect a deductible amount from Holy Name.
On September 4, 1987, Edge Memorial and Jackson Hospital filed a complaint in the Circuit Court of Jefferson County, Alabama, for a declaratory judgment against St. Paul, seeking a determination that St. Paul must defend and pay certain claims. St. Paul filed a motion to dismiss and a counterclaim for declaratory judgment. The plaintiffs amended their complaint to add as parties plaintiff, Mutual Assurance Company of Alabama, Inc., and Holy Name of Jesus Medical Center. Subsequently, Jackson Hospital dismissed its claims against St. Paul because its claims had been compromised and settled.
Plaintiffs, Edge Memorial and Holy Name, and the defendant, St. Paul, then filed cross motions for summary judgment, alleging that there was no genuine issue as to any material fact and that the issues could be resolved as a matter of law. A *Page 1318 
hearing was held and briefs were submitted to the trial judge, the Honorable Marvin Cherner. On August 23, 1990, the trial judge entered a summary judgment for the hospitals on the issue of malpractice insurance coverage. The trial judge also entered a summary judgment for Holy Name in respect to St. Paul's counterclaim to collect a deductible amount from the hospital. St. Paul appeals. We affirm.
The facts are undisputed and are set forth by the trial judge in his order, which the appellant and the appellees have adopted by reference in their briefs to this Court.
 "Edge Memorial and Holy Name are hospitals which were insured under a professional liability insurance policy issued to each of them by St. Paul. The insurance policies which St. Paul issued to the two hospitals are identical.
 "Both hospitals decided to allow their insurance policies with St. Paul to expire without renewal and to obtain insurance coverage instead from MASA.
 "MASA advised both hospitals, as a part of MASA's 'pre-effective date loss identification procedure,' to search their records for potential claims and to report those claims to St. Paul prior to the end of the insurance term of the St. Paul policies.
 "Approximately one week before Edge Memorial's policy with St. Paul expired (Edge Memorial's policy expired January 16, 1987), W.D. Walley, an Edge Memorial administrator, sent nine letters by express mail and also by hand delivery to St. Paul referring to 9 potential claims against Edge Memorial. Among those letters was one letter regarding a potential claim by Polly King. That letter reads as follows:
" 'January 9, 1987:
 " 'I am writing to you regarding the above referenced patient. It should be emphasized that this letter is not a patient incident report rather, we are reporting this situation to you because we believe it will most likely finalize in litigation.
 " 'This 27 year old white female delivered an apparently premature baby by repeat C-Section on 1-1-85. The Dubowitz score was 27 weeks. The baby had to be transferred to Baptist Medical Center Neonatal ICU in Montgomery, and we're sure the family incurred additional medical expenses.
 " 'Our concern is that the patient could allege our hospital failed to provide appropriate professional services.
 " 'A copy of the patient's chart is available upon your request should you decide to investigate this claim.'
 "A malpractice lawsuit was subsequently filed against Edge Memorial based on the occurrence referred to in Edge Memorial's January 9, 1987, letter, styled as follows:
 " 'Charles Alva King, a minor, by and through his father and next friend, Charles R. King, Polly M. King, and James R. King v. Edge Memorial Hospital, et al., civil action number CV 87-553-PH.'
 "Holy Name also followed MASA's advice, and on the last day of its St. Paul policy coverage period, hand delivered 15 letters to St. Paul outlining 15 potential claims against it.
 "Of those 15, two have since resulted in lawsuits against Holy Name. These actions are styled as follows:
 " 'William Michael Morrison v. Holy Name of Jesus Hospital, et al., civil action number CV 87-825-WWC;
 " 'Sharlisia Suttle Williams, as Administratrix of the Estate of Lillie Mae Sumpter v. Holy Name of Jesus Medical Center, et al., Circuit Court of Etowah County, Alabama, CV 89-124.'
 "The letter concerning William Morrison is set out below:
" 'July 31, 1987
" 'Dear Mr. Harris:
 " 'I am writing to you regarding this patient and of the potential litigation that may arise due to this claim. This patient was admitted to Holy Name of Jesus Hospital on 5/20/87 with a diagnosis of gastro intestinal bleeding. While undergoing treatment for erosive *Page 1319 
gastroduodenitis, he apparently became dissatisfied with the treatment and left the hospital without notice on 5/23/87 without signing an "against medical advise" [sic] form.
 " 'Shortly after leaving the hospital we received a request for medical records from attorney Ralph Coleman of Birmingham.
 " 'Due to this patient's apparent dissatisfaction, and attorney Coleman's past track record of filing medical malpractice suits, we are concerned that this matter may become embroiled in litigation and are reporting this to you for any investigation that you deem necessary. Our staff and personnel stand ready to assist you in any way possible.'
 "The letter concerning Lillie Mae Sumpter reads as follows:
" 'July 31, 1987
" 'Dear Mr. Harris:
 " 'I am writing to you about the above referenced claim regarding this patient who was admitted to Holy Name of Jesus Hospital on 3/9/87 and expired in our hospital on 4/15/87.
 " 'This 38 year old black female was burned while at work, and was treated for these second and third degree burns to her face while in admission at our hospital. During the hospitalization and immediately following her demise, the family expressed hostility toward the hospital and threatened suit.
 " 'Due to the high likelihood of a suit being filed in regard to this claim, we are alerting you to this situation. Our employees and the medical records are available to you for any investigation you deem necessary.' "
The first question presented is whether the trial court erred in declaring that Edge Memorial and Holy Name properly submitted claims to St. Paul during their respective policy periods so as to be entitled to coverage under their claims-made policies.
We affirm the judgment of the trial judge and adopt his order as the opinion of this Court:
"St. Paul says that these letters are nothing more than 'patient incident reports' which cannot serve as the hospital's report of a claim or potential claim under the terms of the insurance policy.
"However, it is this Court's opinion that each of the letters contains sufficient information to place St. Paul on notice of the relevant facts concerning why each particular incident could result in a liability claim. The letters are not merely 'patient incident reports,' but are notices of potential claims made to comply with St. Paul's insurance policy requirements for making a claim for insurance.
"St. Paul also says that the provision of its policy requiring notice of a 'claim' refers to a 'claim' for damages made by the injured person to the insured (hereinafter 'legal claim'), by making demand for damages by letter or in a complaint filed in a lawsuit; that claim does not refer to the notice of a potential claim made by the insured to the insurer, (hereinafter 'insurance claim').
"St. Paul says that this is a 'claims-made' policy, and the ordinary meaning of 'claims-made' is that a legal claim must be made by the injured against the insured during the effective dates of the insurance policy.
"However, the meaning of the terms 'claims' and 'claims-made' as those terms appear in St. Paul's insurance policy are in dispute.
"The word 'claim' appears a number of times in St. Paul's policy. Sometimes the word 'claim' appears to meaninsurance claim; at other times it is used to mean 'legalclaim'.
"For example, under the 'General Rules' section of the policy the following sentences contain the word 'claim':
 " 'If we submit to an appraisal, we'll still retain our right to deny the claim (insurance claim?' (p. 2.)
 " 'No one can sue us on a liability claim (legal claim?) until the amount of the protected person's liability has been finally *Page 1320 
decided either by a trial or by a written agreement signed by the protected person, by us and by the party making this claim (insurance claim?).' (p. 3.) " 'Once liability has been determined by judgment or by written agreement, the party making the claim (legal claim or insurance claim) may be able to recover under this policy, up to the limits of coverage that apply.' (p. 3.)
"Other sentences in the insurance policy which include the word 'claim' read as follows:
 " 'If we settle with the owner, the owner's release will satisfy any claim (insurance claim?) you make for the same loss.' (Valuable Papers Section, p. 4.)
 " 'Claims (legal claims or insurance claims?) for bodily injury or property damage are only covered if the injury or damage results from an accidental event.' (p. 1, Health Care portion of policy.)
 " 'We won't cover claims (insurance claims?) for any of the following liabilities even if they're assumed under a contract or agreement.' (p. 4, Health care portion.)
 " 'If you agree, we can settle any claim (legal claim?) for loss of property with the owner.' (Blanket Employee portion p. 2.)
 " 'We've designed this agreement to protect against liability claims (legal claims?) involving covered autos.' (Auto Liability portion, p. 1.)
"In St. Paul Fire Marine Insurance Co. v. House,315 Md. 328, 554 A.2d 404 (1989), the Court of Appeals of Maryland undertook to interpret . . . 'claims-made' as that term is used in connection with a professional liability insurance policy issued by St. Paul to Homer C. House, M.D. The provisions of St. Paul's insurance policy interpreted by the Maryland Court of Appeals are substantially similar to corresponding provisions in St. Paul's insurance policies which are the subject of dispute in the present case.
"St. Paul's position in House was that the insurance policy issued to Dr. House was a 'claims-made' policy; that the policy defined when a claim is made as 'the date you first report an incident or injury to us or our agent,' and that Dr. House did not report the incident to St. Paul and therefore did not make his claim, in accordance with the policy definition while the policy was in effect. St. Paul v. House, 554 A.2d at 406. Dr. House contended that the policy was ambiguous and that he reasonably interpreted the policy to mean that so long as the injured party made his claim against Dr. House during the term of the policy, Dr. House was afforded coverage even though Dr. House did not give notice to St. Paul during the term of the policy.
"In House, the 'claims-made' provision in St. Paul's insurance policy reads:
 " 'A claim is made on the date you first report an incident or injury to us or our agent.'
 "St. Paul Insurance v. House, supra, 554 A.2d at 407.
"In the present case a substantially similar provision [appears] in St. Paul's insurance policies with Edge Memorial and Holy Name. It reads as follows:
 " 'We'll consider a claim to be made on the date it was first reported to us or one of our agents.'
"In House, St. Paul asserted that under its 'claims-made' policy, by definition, an insurance claim is effectively made when the insured reports the potential legal claim to St. Paul. St. Paul said that it intended the term 'claims-made' as used in its policy to apply to the insurance claim made by the insured to the insurer, not the legal claim made by the injured person to the insured.
 " 'The premise of St. Paul's argument is that the clause — "When is a Claim Made?" — exclusively controls how a claim is made under this policy. St. Paul treats that clause as a special definition which changes the ordinary meaning of "claim made." The ordinary meaning of "claim made" refers to the assertion of a claim by or on behalf of the injured person against the insured. In this case Platzer's claim was made, in the ordinary meaning, during the policy period. St. *Page 1321 Paul reads the policy specially to define "claim made " as the reporting of a claim or potential claim by the insured to the insurer. On that basis the claim was not made until after the policy had expired. (Emphasis added.)'
"St. Paul Fire Marine Insurance Co. v. House, supra, 554 A.2d at 407.
"The Maryland Court of Appeals held that the term 'claims made,' as used by St. Paul was ambiguous, that it could be reasonably construed to refer to legal claims made by the injured to the insured (the ordinary meaning) as well as toinsurance claims made by the insured to the insurer.
"Chief Judge Murphy, agreeing with St. Paul, filed a dissenting opinion, arguing that the policy at issue was notambiguous, that the only meaning of 'claims made' under St. Paul's policy was 'insurance claims made by the insured to theinsurer.'
A portion of his dissenting opinion reads as follows:
 " 'By attaching its own self-created labels to selected policy provisions, the majority clouds the interpretation and meaning of an essentially straightforward liability policy. First, the policy provision containing the insuring agreement clearly indicates that it is of the "claims made" type; it directs special attention to the provisions entitled "When is a claim made" and "Optional reporting endorsement." In describing the scope of coverage, the policy specifically states that "[t]he claim must . . . first be made while this agreement is in effect." The next clause defines "When a claim is made" as "the date you first report an incident or injury to us or our agent. (Emphasis supplied.)" The report to the insurer must contain the following information:
— Date, time and place of the incident.
 — What happened and what professional service you performed.
— Type of claim you anticipate.
— Name and address of injured party.
— Name and address of any witness.
 It is therefore clear that reporting is a prerequisite to coverage, whether the insured reports a demand made against him by an injured person, or whether the insured reports an incident which may lead to this kind of a demand.
 " 'The other policy provisions do not weaken the clarity of the reporting requirement. The clause describing the coverage of the optional reporting endorsement, for example, states that it will cover "[c]laims that are first made or reported to us after the ending date of this agreement and before the reporting endorsement ends." (Emphasis supplied.) The phrase "made or reported to us" does not offer an alternative; it simply refers back to the definition of "claims made" under the policy. This language reminds the insured that a claim, to be "made," must be reported to the insurer. The majority is creating ambiguity where none exists.
 " 'The same is true of the majority's interpretation of the provisions under the section concerning "What To Do If You Have A Loss" — "Someone Is Injured or Something Happens Which Can result In A Liability Claim." It is obvious that the "claims" referred to therein are "liability claims" by an injured person against the insured. This language does not create an ambiguity and does not cast any doubt on the policy's requirement of reporting before coverage can exist. (Emphasis added.)
"House, supra, 554 A.2d at 411.
"St. Paul, in the present case before this Court, now takes the opposite position from the position asserted by it inHouse, supra. St. Paul now says that the same insurance policy provision construed in House, is not ambiguous and requires theinjured person to make claim upon the insured during the term of the policy (the ordinary meaning of 'claims made').
"In support of its position, St. Paul cites the case,Langley v. Mutual Fire, Marine and Inland Insurance Company,512 So.2d 752 (Ala. 1987), overruled on other grounds, Hickox v.Stover, 551 So.2d 259, 264 (Ala. 1989). In Langley, the Alabama Supreme Court reviewed an ordinary *Page 1322 
'claims made' insurance policy issued by Mutual Fire, Marine and Inland Insurance Company:
 " 'The policy issued to Dr. Langley by Mutual Fire was a "claims made" insurance policy. The first sentence appearing in Dr. Langley's policy is a statement alerting the insured as to the nature of the "claims-made" type of policy; it provided as follows:
 " ' "Claims Made Policy: Except to such extent as may be provided otherwise herein, this policy is limited to liability for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE. Please review the policy carefully."
 " 'Further down on the same page of the policy, under the section entitled "The Coverage," there appears another statement explaining the claims-made character of the policy:
 " ' "Claims Made Clause: This policy applies to CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD arising out of malpractice committed or alleged to have been committed subsequent to the retroactive date set forth in the Declarations."
"Langley, supra, at 754.
"The Mutual Fire insurance policy clearly expresses that claims must be 'made against the insured while the policy is in force.'
"However, the language in the Mutual Fire insurance policy is obviously not the same as the language in St. Paul's policies in the present case. Unlike the Mutual policy, St. Paul's insurance policies do not have language requiring claims to be made against the insured while the policy is in force.
"St. Paul says that this requirement is stated in the following provision of its insurance policy:
 " '. . . the claim is first reported to us or one of our agents while this agreement is in effect.'
"Language in an insurance policy should be given the same meaning which a person of ordinary intelligence (not a lawyer) would reasonably conclude the language means.[National] Union Fire Insurance Co. v. Leeds, 530 So.2d 205,207 (Ala. 1988).
"An attorney may know that the ordinary legal meaning of 'claims-made' is that the injured must make a legal claim against the insured. However, St. Paul's policy defines 'claims-made' to mean the insured must make a claim against the insurer. See, House, supra, 554 A.2d at 407, 411. A person of ordinary intelligence reading the St. Paul insurance policy would give great weight to St. Paul's definition of 'claims-made' in its insurance policy, not knowing that the St. Paul definition differs from the ordinary legal meaning of 'claims-made.'
"Ambiguous language in an insurance policy must be construed by the courts liberally in favor of the insured and strictly against the insurance company. National Union FireInsurance Co. v. Leeds, 530 So.2d 205, 207 (Ala. 1988).
"Insurance policies, typically, are carefully drafted to designate what is covered and what is excluded from coverage in order to avoid confusion. Possibly the single most important word in St. Paul's 'claims-made' policy is the wordclaim. It is essential for the insured to know what constitutes a legal claim in order to ascertain what coverage the insured can expect to receive under the insurance policy. St. Paul failed to define the word claim in its insurance policy. St. Paul might easily have drafted the disputed provision to require 'the injured person to make claim (by filing a lawsuit, etc.) against the insured' during the effective dates of the policy. See, e.g., Langley, supra, at 754. It failed to do so.
"Accordingly, this Court finds that the St. Paul policies only impose the following requirements on the insured in making an insurance claim:
"1. The incident for which the insured seeks coveragemust occur within the effective dates of the policy;
"2. The incident for which the insured seeks coveragemust be reported to St. *Page 1323 
Paul within the effective dates of the policy; and
"3. The report concerning the incident for which the insured seeks coverage must contain more particular information designating an incident as a potential claim rather than a 'Patient Incident Report.'
"The relevant portions of St. Paul's insurance policies read as follows:
 " 'HOSPITAL PROFESSIONAL LIABILITY PROTECTION — CLAIMS MADE
" 'We've designed this agreement to protect against liability claims resulting from professional services provided or which should have been provided by your hospital. Of course there are limitations which are explained later in this agreement.
 " 'IMPORTANT NOTE. This is a claims-made coverage. Please read it carefully, especially the When A Claim Is Covered section.
" 'WHEN A CLAIM IS COVERED
 " 'The coverage provided by this agreement applies only when both of the following conditions are met:
 " 'the claim is based on an act or omission that happened after the retroactive date shown in the Coverage Summary; and
 " 'the claim is first reported to us or one of our agents while this agreement is in effect.
 " 'We'll consider a claim to be made on the date it was first reported to us or one of our agents.
 " 'However, we won't consider a patient incident report to be your report of a claim — made even if you send it to us or one of our agents.
"WHAT TO DO IF YOU HAVE A LOSS:
 " 'Someone Is Injured Or Something Happens Which Can Result In A Liability Claim
 " 'If an accident or incident occurs that may involve this policy, you or any other protected person involved must:
 " '1. Notify the police if a law may have been broken.
 " '2. Tell us or our agent what happened as soon as possible. Do this even though no claim has been made but you or another protected person is aware of having done something that may later result in a claim. This notice should include:
" ' * The time and place of the event;
" ' * The protected person involved;
 " ' * The specific nature of the incident including the type of claim that may result; and
 " ' * The names and addresses of any witnesses and injured people.
 " 'IMPORTANT EXCEPTION FOR HOSPITALS
 " 'If Professional Hospital Liability Protection-Claims Made is included in this policy, we won't consider a "Patient Incident Report" or "Variance Report" to be your report of a claim made — even if you send it to us or one of our agents.
 " '3. Send us copies of all demands or legal documents if someone makes a claim or starts a lawsuit.
 " '4. Cooperate and assist us in securing and giving evidence, attending hearings and trials, and obtaining the attendance of witnesses.
 " '5. Not assume any financial obligation or pay out any money without our consent. But this rule doesn't apply to first aid given to others at the time of an accident.' (Emphasis added.)
"Edge Memorial and Holy Name have complied with the terms of their insurance policies with St. Paul and are entitled to coverage with respect to the three lawsuits filed against them. Summary judgment is therefore due to be granted in favor of Edge Memorial and Holy Name with respect to this issue."
The second question presented concerns St. Paul's counterclaim for the collection of a deductible amount from Holy Name in the matter of Claudia Childs. We must determine whether the trial judge erred in his holding that St. Paul breached *Page 1324 
its legal duty to Holy Name by failing obtain the hospital's consent before settling the Childs claim and thus cannot collect a deductible from the hospital. The facts surrounding this issue are also set forth in the trial court's judgment. We affirm the judgment of the trial judge as to this issue and adopt his reasoning as the opinion of this Court:
 "ST. PAUL'S COUNTERCLAIM
"St. Paul has also asserted a counterclaim against Holy Name, the material facts of which are not in dispute. St. Paul and Holy Name have both filed motions for summary judgment with respect to this counterclaim.
"On October 8, 1986, Claudia Childs went to visit her daughter, a patient at Holy Name hospital. After visiting with her daughter, Claudia Childs left the hospital, and began walking toward her car down a dirt pathway adjacent to the hospital. The dirt pathway had been used as an alternative walkway from the hospital to the parking lot.
"Before Claudia Childs arrived at her car, she slipped on some gravel in the pathway and fell to the ground, injuring her right leg.
"Claudia Childs was subsequently admitted to Holy Name and treated by Dr. Rivard for the fracture of her right tibia and fibula. The medical expenses which she incurred for the treatment of the injuries sustained in the fall totalled approximately $7,000.00.
"On October 14, 1986, Ginger Woodard, Administrative Coordinator for Medical Affairs at Holy Name, sent a copy of Claudia Childs' patient incident report to St. Paul's Claim Representative, Dale Nellums.
"On November 21, 1986, Ginger Woodard received a letter from Mac Downs, an attorney representing Claudia Childs. In the letter, Mac Downs stated, 'I wish to make a claim on . . . behalf [of Claudia Childs] with your insurance carrier and if you wish to discuss this matter prior to litigation, please have your carrier contact me within fifteen days.' On the same day, Ginger Woodard forwarded a copy of Mae Downs's letter to Dale Nellums at St. Paul.
"On November 9, 1987, Dale Nellums of St. Paul submitted a request for payment of $10,000.00 to Holy Name. The request stated that the Claudia Childs case had been settled, and Holy Name was required to reimburse St. Paul in the amount of $10,000.00, representing the deductible amount under the terms of the insurance policy.
"On December 8, 1987, by letter, and on December 10, 1987, by telephone, Ginger Woodard of Holy Name contacted Dale Nellums of St. Paul objecting to the manner in which St. Paul handled the Claudia Childs matter. Ginger Woodard requested an explanation why no attorney was appointed to represent Holy Name, and why Holy Name was not contacted prior to settlement of the Claudia Childs case.
"On December 14, 1987, in response to these objections, Dale Nellums of St. Paul sent the following letter to Holy Name:
 " 'This will confirm our telephone conversation of December 19, 1987 regarding the above referenced matter.
 " 'This claim was first reported to our Birmingham office on October 15, 1986 by a letter from you enclosing the incident report and the emergency room sheet. We then spoke on October 16, 1986 and I requested that you inform me of the claimant's condition following surgery. You called on October 17, 1987 with information on Mrs. Childs and on October 21, 1987 you sent me a copy of her chart.
 " 'On December 2, 1986 I received from you a letter from attorney Mac Downs which stated that he was now representing Mrs. Childs. I was able to speak with attorney Downs on December 8, 1986 and he confirmed, as did the incident report, that there were no witnesses to Mrs. Childs' fall other than her daughter.
 " 'On January 13, 1987 I sent a letter to you stating that the area of the fall would be inspected and photographed. At that time I also asked if you had been able to determine if there were any witnesses. *Page 1325 
You called on January 29, 1987 and confirmed the location of the fall. On February 2, 1987 Greg Wood from our office inspected the area and took photographs.
 " 'On April 1, 1987 I wrote attorney Downs and again requested that I be able to meet with Mrs. Childs and her daughter. A meeting was scheduled for June 30, 1987. At that time recorded statements were taken of Mrs. Childs and her daughter, Carolyn Childs.
 " 'On October 16, 1987 attorney Downs called me and stated that Mrs. Childs had $7,000.00 in medical specials and would be willing to settle for $12,000.00. On October 23, 1987 I called Dr. Rivard's office to confirm the outstanding balance on Mrs. Childs' account. Dr. Rivard treated Mrs. Childs while she was a patient at Holy Name of Jesus Hospital and also continued to treat her following her discharge. I also called Holy Name of Jesus Hospital and asked for you. When I was told you were not available I asked for the bookkeeping department and confirmed that Mrs. Childs did not have an outstanding balance with the hospital. I then called Mac Downs and made an offer of $10,000.00. On October 27, 1987 attorney Mac Downs accepted my offer.
 " 'St. Paul's policies and procedures require that statements be taken from the claimant and any witnesses. Statements were obtained from Mrs. Childs and the only known witness to the fall, Carolyn Childs. Photographs were also taken of the location of the fall and it was determined that since the area in question was obviously being used as an alternative walkway, the hospital had notice of its use and possible dangers. Therefore, since there was possible exposure in this matter the decision was made to settle the case. Based on my evaluation of liability and damages I offered $10,000.00 to settle the claim.
 " 'As a general rule, the St. Paul Fire and Marine Insurance Company does not refer claims to attorneys when suit has not been filed. With the above referenced matter, Mrs. Childs was represented by an attorney but suit had not been filed.
 " 'I apologize if I did not keep you adequately informed during the investigation and settlement of this claim and I hope that this letter has clarified the action that was taken in this matter.'
"Holy Name has not remitted the deductible in the Claudia Childs case to St. Paul. The failure of Holy Name to remit the deductible to St. Paul is the basis for St. Paul's counterclaim against Holy Name in this action.
"The 'Health Care Facility Comprehensive General Liability Protection' portion of the St. Paul insurance policy applies to the insurance coverage of Holy Name in the Claudia Childs matter. That portion of the policy includes a provision for what is covered. It reads in pertinent part:
 " 'Liability coverage. We'll pay amounts you . . . are legally required to pay as damages for covered bodily injury, . . . or personal injury claims.' (emphasis added) (p. 1.)
"It also contains the following provision for defending lawsuits:
 " 'DEFENDING LAWSUITS: We'll defend any suit brought against you or any other protected person for covered claims, even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if we believe that is proper. We'll pay all costs of defending the suit, including interest on that part of any judgment that doesn't exceed the limit of coverage. But we won't defend a suit or pay a claim after the limit has been used up in paying judgments or settlements.' (p. 1.) (Emphasis added.)
"The insurance policy also contains a 'Hospital Liability Protection Deductible Endorsement.' This endorsement provides for a $50,000.00 deductible for each accidental event involving bodily injury or personal injury, and a total deductible of $250,000.00.
"The endorsement further provides:
 " 'You'll be responsible up to the deductible amount for all bodily injury or personal injury claims resulting from an accidental event. We'll pay covered claims over this amount, up to the limits of *Page 1326 
coverage that apply. If a total deductible amount is shown, you won't have to pay more than this amount for all claims that take place in a policy year. By policy year, we mean each consecutive annual period of your policy.
 " 'The deductible won't apply to defense costs. We can pay the deductible to settle a claim. If we do you agree to repay us as soon as we notify you of the settlement.' (Emphasis added.)
"St. Paul says that under the terms of the insurance policy it had the legal right to settle the Claudia Childs case, and it is entitled to reimbursement of the applicable deductible amount from Holy Name.
"St. Paul says it is owed $9,000.00 of the amount of the applicable deductible. The original amount requested ($10,000.00) has been reduced by $1,000.00 under 'Med Pay' provisions of the insurance policy which are not at issue here.
"Holy Name says that it is not liable to St. Paul for reimbursement of the deductible ($9,000.00) because (1) it was never 'legally required' to pay Claudia Childs any amount; (2) it was not informed of the settlement offer prior to settlement; (3) it never consented to settlement; and (4) no attorney was provided to defend Holy Name against Claudia Childs' claim.
"Where there is a provision in an insurance policy which authorizes the insurer to settle any claim against the insured in its discretion, such a provision 'vests the insurer with absolute authority to settle claims within thelimits of the policy with the insured's having no power to compel the insurer to make settlements or to prevent it from so doing.' (Emphasis added.) Employers' Surplus Line Insurance Co.v. Baton Rouge, 362 So.2d 561, 564 (La. 1978); Mitchum v.Hudgens, 533 So.2d 194, 197 (Ala. 1988).
"However, where the insured has a direct financial stake in the litigation, the law generally requires that the insured have control over acceptance or rejection of settlement offers. Mitchum v. Hudgens, 533 So.2d 194, 202 (Ala. 1988) (for instance, where the insurer reserves the right to contest the existence of coverage); Employers' Surplus Line Insurance Co.v. Baton Rouge, 362 So.2d 561, 564-565 (La. 1978) (where settlement prior to judgment requires the insured to pay a deductible). See also, L S Roofing Supply Co. v. St. PaulFire Marine Insurance Co., 521 So.2d 1298, 1303 (Ala. 1987).
"The insured must make the ultimate choice regarding settlement since it is the insured who must eventually pay the settlement amount. See, L S Roofing Supply Co. v. St.Paul Fire Marine Insurance Co., 521 So.2d 1298, 1303
(Ala. 1987).
"In the present case, St. Paul did not inform Holy Name of its intent to settle the Claudia Childs matter. Holy Name had no opportunity to consent to or reject the option to settle. Under the insurance policy, Holy Name was required to reimburse St. Paul for any settlement up to $50,000.00. Holy Name, therefore, had a direct financial stake in any settlement under this portion of the insurance policy.
"Therefore, St. Paul breached its legal duty to Holy Name by failing to obtain Holy Name's consent before settling the Claudia Childs matter for $10,000.00.
"In addition, even in cases where the insured has no direct financial stake in the outcome, an attorney appointed by the insurer to handle a claim against the insured is under an ethical duty to make full disclosure of the progress of the litigation to the insured. Mitchum v. Hudgens, 533 So.2d 194,202 (Ala. 1988). '[A]ppointed counsel should keep [the] client, the insured, apprised of all developments in the case, including settlement negotiations.' Mitchum, supra, at 202.
"Where, as in the present case, the insured has a direct financial stake in the outcome, the attorney's duty to keep the insured informed is greater, since the attorney may not settle the claim at the direction of the insurers over the objection of the insured. Cf., Mitchum, supra, at 202.
"In the present case, Dale Nellums, the St. Paul Claim Representative is also a licensed attorney. However, it does not appear that she, nor anyone else, was appointed to conduct a defense on behalf of the insured. And no attorney appointed by St. Paul advised Holy Name of the settlement negotiations. *Page 1327 
"The provision of the insurance policy authorizing St. Paul the right to settle claims is included under the subheading:'Defending lawsuits.' St. Paul was required under the insurance policy to defend any suit against the insured even if the suit is 'groundless.'
"Where the insured must ultimately pay the amount of a settlement as part of the deductible amount, a reasonable construction of the applicable provision of the insurance contract where it is also considered that the insured must itself pay the amount of the deductible is that the insurer cannot agree to pay money in a settlement which must be repaid by the insured without first obtaining the consent of the insured. See, Employers' Surplus Line Insurance Co. v.Baton Rouge, 362 So.2d 561, 565 (La. 1978).
"It is undisputed that Holy Name did not consent to the settlement of this matter, though it had a direct financial stake in the outcome.
"Accordingly, summary judgment is due to be granted in favor of Holy Name with respect to this issue."
The judgment of the trial court that St. Paul is obligated to defend Edge Memorial and Holy Name against liability arising from the claims asserted against them[1] and to indemnify them against any judgment rendered against them with respect to such claims is due to be affirmed. The judgment of the trial court that, in failing to obtain Holy Name's consent before settling the Claudia Childs matter, St. Paul breached its legal duty to Holy Name and is thus not entitled to collect the deductible from Holy name is also due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ALMON, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] Civil Actions numbered CV-87-553-PH; CV-87-825-WWC; and CV-89-124.