PARKER, Justice.[1]
Advanced Specialty Pharmacy LLC,[2] Meds I.V., Inc. (Advanced Specialty Pharmacy LLC and Meds I.V., Inc., are hereinafter referred to collectively as “Meds I.V,”[3]), and several individual defendants were sued by individuals asserting various wrongful-death and personal-injury claims (“the claimants”). Meds I.V., a company that performs pharmaceutical services, is insured by Pharmacists Mutual Insurance Company (“Pharmacists Mutual”). Pharmacists Mutual filed an interpleader complaint in the action and submitted $4 mil *382 lion to the Jefferson Circuit Court (“the circuit court”), which Pharmacists Mutual alleged was the policy limits of Meds I.V.’s insurance policies with it, and requested that the circuit court divide the insurance moneys among the claimants. The claimants alleged that the policy limits of Meds I.V.’s insurance policies with Pharmacists Mutual were $7 million rather than $4 million. The parties filed cross-motions for a summary judgment, and the circuit court entered a summary judgment in favor of the claimants. We affirm in part, reverse in part, and remand.
Facts and Procedural History
During the time relevant to this case, Meds I.V. produced total parenteral nutrition (“TPN”) that was used by hospitals and administered to patients. TPN is “widely used in healthcare settings to deliver critical nutrients to patients unable to tolerate enteral[4] feeding.” Neil Gupta et al., “Outbreak of Serratia marcescens Bloodstream Infections in Patients Receiving Parenteral Nutrition Prepared by a Compounding Pharmacy,” 59 Clinical Infectious Diseases 1 (May 13, 2014)(Exhibit B to the claimants’ motion for a summary judgment). TPN is nutrition “maintained entirely by central intravenous injection or other nongastrointestinal route.” Sted-man’s Medical Dictionary 1245 (27th ed. 2000). The “ ‘intravenous formulation is intended to provide all daily nutritional requirements, such as electrolytes, amino acids, dextrose, and lipids, and is considered to be one of the most complex pharmaceuticals to prepare because of the need for careful titration and combination of multiple components.’ ” The claimants’ motion for a summary judgment (quoting Gupta et al., “Outbreak of Serratia mar-cescens Bloodstream Infections,” 59 Clinical Infectious Diseases 1).
According to a memorandum from the Centers for Disease Control and Prevention (“the CDC”), attached as Exhibit A to the claimants’ motion for a summary judgment, at Meds I.V.’s facility, “TPN products were compounded by a pharmacy technician in consultation with a licensed pharmacist.” Most ingredients for TPN, including an amino-acid solution, were provided by a manufacturer in sterile, multi-dose vials. However, as a result of a shortage in the manufacturer’s supply of amino-acid solution, Meds I.V. began preparing its own amino-acid solution. According to the same memorandum, to prepare the amino-acid solution, Meds I.V. mixed amino-acid “[pjowders ... with sterile water in a 100-liter non-sterile container.” Then, pursuant to a prescription written by a physician, Meds I.V. compounded the amino-acid solution with other ingredients to produce the prescribed TPN. The affidavit of Donald Bendure, an independent consultant hired by the claimants whose expertise included matters pertaining to risk management, commercial insurance, and insurance litigation, described Meds I.V.’s process for producing TPN:
“[Tjhere were two separate and distinct operations by Meds I.V. that led to the final TPN product delivered from Meds I.V. to the end-user patients: 1) a bulk manufacturing process of [amino-acid solution] not subject to a prescription requirement ... which were [sic] then stored for future use as one ingredient ..., followed by 2) a series of subsequent compound drug preparations, each according to specific individual prescri-ber/patient/pharmacist requirements
*383 (Emphasis omitted.) Meds I.V. received requests daily from physicians to fill prescriptions for TPN.
In October 2010, Pharmacists Mutual issued to Meds I.V. two insurance policies: (1) the Business Owners Special Policy (“the business-owners policy”) and (2) the Commercial Umbrella/Excess Liability Coverage Policy (“the excess policy”) (the business-owners policy and the excess policy are hereinafter referred to collectively as “the policies”). The policies provided coverage to Meds I.V. from October 28, 2010, until October 28, 2011, during which the events giving rise to this case occurred.
The business-owners policy has a “general aggregate limit” of $3 million, a “products/completed work hazard aggregate limit” of $2 million, and :an “each occurrence limit” of $1 million, as detailed on the declarations page of the policy. The excess policy provides additional coverage in conjunction with Pharmacists Mutual’s obligation to provide coverage under the business-owners policy. Under the excess policy, Pharmacists Mutual agreed to pay, “up to [its] limit, all sums in excess of ‘underlying insurances’ [the business-owners policy] for which [Meds I.V.] becomes legally obligated to pay as ‘damages’ to which this insurance applies.” The excess policy has an “each occurrence limit” of $1 million, a “general aggregate limit” of $1 million, a^d a “products/completed work hazard aggregate limit” of $1 million, as detailed on the declarations page of the policy.
The business-owners policy provides two main categories of coverage: “Property Coverages” and “Commercial Liability Coverages.” “Commercial Liability Coverages” include four coverage categories: “Coverage L—Bodily Injury and Property Damage Liability”; “Coverage M—Medical Payments”; “Coverage O—Fire Legal Liability”; and “Coverage P—Personal and Advertising Injury Liability.” It is undisputed that “Coverage L” of the business-owners policy, which covers bodily injury, is the only coverage applicable in this case.
In March 2011, the CDC was notified of five patients in a hospital located in Birmingham, Alabama, who had contracted bloodstream infections (“BSIs”) as a result of the presence in their bodies of bacteria Serratia marcescens (“S. marcescens”). According . to the memorandum from the CDC, S. marcescens is “an opportunistic pathogen of the respiratory tract, urinary tract, and wounds [that] has been implicated in outbreaks of [BSIs] associated with contamination of intravenous products.” After receiving notification that those patients had contracted BSIs, the CDC began an investigation and determined that the BSIs were caused by TPN produced by Meds I.V. that was .contaminated with S. marcescens. Later, the CDC discovered at least 19 patients in 6 Alabama hospitals who had contracted BSIs as a result of contaminated TPN produced by Meds I.V. between January 2011 and March 2011; of those patients, 17 tested positive for the presence of S. marcescens. Nine deaths occurred as a result.
Concerning the cause of the contamination of the TPN that resulted in the BSIs in the claimants or those whom the claimants represent, Don McGuire, general counsel for Pharmacists Mutual, stated in an e-mail to Pharmacists Mutual’s reinsurer that one “pharmacy technician” at Meds I.V. had indicated that there were “a number of procedure violátions that could have resulted in a contaminated solution” of the TPN, and that “[o]ne important lapse was that ... on at least 3 occasions, bags were not quarantined and tested prior to 'their being used in compounding patient orders.” McGuire further explained that “[i]t *384 is difficult to point to one piece of faulty equipment, for' example, as the sole cause of these claims,” given “the number of breaches allegedly committed by” Meds I.V.
Pharmacists Mutual’s outside counsel, Michael Ryan, reached a similar conclusion, as illustrated in the following excerpt from a letter he wrote to McGuire:
“The information provided by defense counsel [for Meds I.V.] ■... suggests that -there may be a number of different, independent violations of the standard of care which caused the contamination, including:
“Using non-sterile barrel;
“Using distilled water instead of sterile water to compound TPN;
“Failing to put finished bags of TPN through the quarantine process;
“Diluting amino acid solution with distilled water to make it go further;
“Using filters that were overworked or possibly dysfunctional; and
“Failing to respond to amino acid that was not the proper color and was too dark.”-
According to Ryan, there were “a number of independent - acts[,] each one of which could constitute a violation of [the] standard of care and each one of which could have caused the contamination,” and, for that reason, he stated, “[w]e are not ,., dealing with a single act or omission that affects multiple prescriptions” but, “[instead, we have multiple acts or omissions that appear to have affected multiple prescriptions.”
Through its investigation, the CDC concluded that “the tap water or the amino acid powder may have been the likely source for introduction, and subsequent contamination, of the TPN' products.” Moreover, the CDC identified the following deviations by Meds I.V. from the United States Pharmacopeia guidelines that likely contributed to the contamination of the TPN:
“Excessive particulate matter in the pre-fíltered amino acid solution interrupted flow across the filter membrane and likely interfered with the efficiency of the filter.
“Replacement of the filter caused a break in the system and served as a potential source for the contamination of the laboratory hood and solutions 'downstream of the filter.
“Storage of the mixed amino acid powders in-sterile water 1-2 days prior to filtration on some occasions may have contributed to overgrowth of bacteria and generation of bacterial endotoxins.
“Sampling of a small volumes (<25mL) of the lOOL-amino acid solution was likely insufficient to detect bacterial growth on sterility testing.”
In 2011, the claimants filed wrongful-death actions -and personal-injuries claims against Meds I.V,, among others, to recover damages for, the bodily injuries and deaths allegedly suffered as a result of the RSIs, which were caused by the contaminated TPN produced by Sleds I.V,
On May 10, 2012, Pharmacists Mutual filed a “complaint in interpleader” in the action in the circuit court and sought a discharge from its indemnity obligations under the policies by depositing $4 million with the clerk of the circuit court. Pharmacists Mutual alleged that the $4 million represented “the full amount of primary liability insurance coverage.and excess/umbrella insurance coverage” available under the policies. The $4 million was based solely on the general aggregate limits of the policies • ($3 million under the business-owners policy -and $1 million under the excess policy), without regard to the products/completed-work-hazard aggregate *385 limits. Pharmacists Mutual requested immediate discharge from all liability on the underlying claims subsequent to its deposit of $4 million with the circuit court clerk.
On April 19, 2013, the claimants filed amended answers to Pharmacists Mutual’s complaint in interpleader ■ and counterclaims, which sought judgments -declaring the coverage under the policies. The claimants argued that their claims against Meds I.V. included both professional negligence and products liability. Thus, the claimants alleged that—in addition to the $4 million general aggregate limits ($3 million under the business-owners policy and $1 million under the excess policy) applicable to the professional-negligence claims—the products/eompleted-work-hazard aggregate limits of $2 million under the business-owners policy and $1 million under the excess policy should apply based on the claimants’ products-liability claims. Thus, the claimants sought a total of $7 million, representing “the sum of the two aggregate limits listed on the Declaration Sheets”—$4 million for the professional-negligence claims and $3 million for the products-liability claims.
On November 6, 2013, the claimants filed a motion for an order of disbursement of the $4 million. The claimants also asked that-the circuit court retain jurisdiction to determine the amount of additional insurance coverage, if any, available. The circuit court - ordered the disbursement, as follows: • -
“There being no dispute about the fact that [Pharmacists Mutual] is obligated to pay at least $4 million in coverage ... the [circuit court] is hereby directing the Clerk to disburse the approximately $4 million that is not in dispute. ... The [circuit court] retains jurisdiction to adjudicate the issue of whether [Pharmacists Mutual’s] liability limits exceed the admitted $4 million, and a separate order addresses the procedure for adjudicating that remaining issue.”-
The parties, later filed cross-motions for a summary judgment. On August 26, 2014, the circuit court granted the • claimants’ summary-judgment motion and denied Pharmacists Mutual’s motion. In its summary-judgment order, the circuit court determined that
“the 'Serratia marcescens likely- reached the claimants and their decedents because of (1) multiple contaminations during the manufacturing by Meds I.V. of an amino acid solution, which was produced without-a physician’s prescription or involvement and, among other ingredients, was-ultimately used by Meds IV. as a component of the compound TPN; and (2) multiple contaminations, separ rate and distinct from.those contamina-tions that occurred during the manufacturing of the amino acid solution, during the compounding of the TPN by Meds I.V. pursuant to physicians’ prescriptions.”
The circuit court concluded:
“1, Pursuant to the [business-owners policy], Pharmacists -Mutual owes Meds I.V. the following in indemnity obligations: -
“a. As acknowledged-- by -Pharmacists, Mutual, Pharmacists Mutual owes $3 million in indemnity-to Meds I.V. as a result of the ‘bodily injuries,’ suffered by .the claimants and their decedents, that were caused by the multiple ‘occurrences’ associated with the ‘pharmacy, services’ at Meds I.V.;
“b. Pharmacists Mutual owes $2 million in indemnity to Meds I.V. as a result of the ‘bodily injuries,’ suffered by the claimants and their-- decedents, that were caused by the multiple ‘occurrences’—of which there were, at least, three ‘occurrences’ distinct from the ‘occurrences’ that happened dur *386 ing the ‘compounding' of the TPN— associated with the ‘manufacturing' activities at Meds I.V.; and
“c. Pharmacists Mutual’s indemnity-obligations to Meds I.V. under the general aggregate.limit and the products/completed work hazard aggregate limit are not mutually exclusive and, as applied to these circumstances, must be aggregated for purposes of indemnifying Meds I.V. as a result of the ‘bodily injuries’ suffered by the claimants and their decedents. Accordingly, there is $5 million in coverage available to the claimants under the [business-owners policy].
“2. Pursuant to the excess policy, Pharmacists Mutual owes Meds I.V. the following in indemnity obligations:
“a. As acknowledged by Pharmacists Mutual, Pharmacists Mutual owes $1 million in indemnity to Meds I.V. as a result of the ‘bodily injuries,’ suffered by the claimants and their decedents, that were caused by the multiple ‘occurrences’ associated with the ‘pharmacy services’ at Meds I.V.;
“b. Pharmacists Mutual owes $1 million in indemnity to Meds I.V.'as a result of the ‘bodily injuries,’ suffered by the claimants and their decedents, that were caused by the multiple ‘occurrence’—of which there were, at least, three ‘occurrences’ distinct from the ‘occurrences’ that happened during the ‘compounding' of the TPN— associated with, the ‘manufacturing’ activities at Meds I.V.; and
“c. Pharmacists Mutual’s indemnity obligations to Meds I.V. under the general aggregate limit and the products/completed work aggregate limit are not mutually exclusive and, as applied to these circumstances, must be aggregated for purposes of indemnifying Meds I.V. as a result of the ‘bodily injuries’ suffered by the claimants and their decedents. Accordingly, there is $2 million in coverage available to the claimants under the excess policy.
“Finally, Pharmacists Mutual has already paid the sum of $4 million into court, and that $4 million has been disbursed to the claimants in accordance with the procedures previously approved by the court and the parties. In order to be discharged from the indemnity obligations under the [policies], Pharmacists Mutual is ordered to pay into court an additional sum of $3 million, which shall then be disbursed ... to the claimants in accordance with the same procedures previously approved by the court and the parties and used to disburse the initial $4 million.”
Pharmacists Mutual appealed.
Standard of Review
“Our standard of review for a summary judgment is as follows:
“ ‘We review the trial court’s grant or denial of a summary-judgment motion de novo, and we use the same standard used by the trial court to determine whether the evidence presented to the trial court presents a genuine issue of material fact. Bockman v. WCH, L.L.C., 943 So.2d 789 (Ala. 2006). Once the summary-judgment movant shows there is no genuine issue of material fact, the non-movant must then present substantial evidence creating a genuine issue of material fact. Id. “We review the evidence in a light most favorable to the nonmovant.” 943 So.2d at 795. We review questions of law de novo. Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330 (Ala. 2006).’ ”
Lloyd Noland Found., Inc. v. HealthSouth Corp., 979 So.2d 784, 793 (Ala. 2007) (quoting Smith v. State Farm Mut. Auto. Ins. *387 Co., 952 So.2d 342, 346 (Ala. 2006)). “Additionally, ‘[w]hen a circuit court interprets an insurance policy as a matter of law, that interpretation is subject to, de novo review.’ Hartford Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So.2d 1006, 1009 (Ala. 2005).” Ex parte State Farm Mut. Auto. Ins. Co., 118 So.3d 699, 704 (Ala. 2012).
Discussion
The issues before this Court concern the interpretation of the policies. Concerning the interpretation of an insurance policy, this Court has stated:
“ ‘When analyzing an insurance policy, a court, gives words used in the policy their common, everyday meaning and interprets them ás a reasonable person in the insured’s position would have understood them. Western World Ins. Co. v. City of Tuscumbia, 612 So.2d 1159 (Ala. 1992); St. Paul Fire & Marine Ins. Co. v. Edge Mem’l Hosp., 584 So.2d 1316 (Ala. 1991). If, under this standard, they are reasonably certain in their meaning, they are not ambiguous as a matter of law and the rule of construction in favor of the insured does not apply. Bituminous Cas. Corp. v. Harris, 372 So.2d 342 (Ala. Civ. App. 1979). Only in cases of genuine ambiguity or inconsistency is it proper to resort to rules of construction: Canal Ins. Co. v. Old Republic Ins. Co., 718 So.2d 8 (Ala. 1998). A policy is not made ambiguous by the fact that the parties interpret the policy differently or disagree as to the meaning of a written provision in a contract. Watkins v. United States Fid. & Guar. Co., 656 So.2d 337 (Ala. 1994). A court must not rewrite a policy so as to include or exclude coverage that was not intended. Upton v. Mississippi Valley Title Ins. Co., 469 So.2d 548 (Ala. 1985).’
“B.D.B. v. State Farm Mut. Auto. Ins. Co., 814 So.2d 877, 879-80 (Ala. Civ. App. 2001). However, if a provision in an insurance policy is found to be genuinely ambiguous, ‘policies of insurance should be construed liberally in respeet to persons insured and strictly with respect to the insurer.’ Crossett v. St. Louis Fire & Marine Ins. Co., 289 Ala. 598, 603, 269 So.2d 869, 873 (1972).”
State Farm Mut. Auto. Ins. Co. v. Brown, 26 So.3d 1167, 1169-70 (Ala. 2009).
A basic overview of the business-owners policy is necessary to understand the parties’ arguments. The business-owners policy states that Coverage L “applies only to ‘bodily injury’ ... caused by an ‘occurrence.’ ” An “occurrence” is defined in the business-owners policy as “an accident and includes continuous or repeated exposure to similar conditions.” As stated above, the parties agree that numerous occurrences caused the claimants to suffer bodily injuries, to which Coverage L applies.
Coverage L of the business-owners policy states that “[t]he amount [Pharmacists Mutual] will pay for ‘damages’ is limited as described under How Much We Pay.” “Damages” is defined in the business-owners policy as “compensation in the form of money for a person who claims to have suffered an injury.” The “How Much We Pay” section of the business-owners policy, which was amended by the “pharmacy services professional liability coverage” endorsement, states, in pertinent part:
“How Much We Pay ...
“1. The ‘limits’ shown on the ‘declarations’ and subject to the following conditions, are the most [Pharmacists Mutual will] pay regardless of the number of:
“a) ‘insureds’ under the Commercial Liability Coverages;
“b) persons or organizations who sustain injury or damage; or
*388 “c) claims made or ‘suits’ brought; or
“d) policy periods involved.
“[Pharmacists Mutual’s] total liability under Commercial Liability Coverages for damages resulting from one loss will not exceed the ‘limits’’ shown on the declarations page. All ‘bodily injury'.., resulting from one ‘occurrence’ ... is considered the result of one loss.
“2. The General Aggregate Limit is the most [Pharmacists Mutual] will pay for the sum of:
“a. all ‘damages’ under Coverage L, except ‘damages’ due to ‘bodily injury’ ... included in the ‘products/completed work hazard’;
[[Image here]]
“3. The • Products/Completed Work. Hazard Aggregate Limit is the most [Pharmacists Mutual] will pay for ‘damages’ due to ‘bodily injury’ ... included in the ‘products/completed work hazard.’
[[Image here]]
“8. The General Aggregate- Limit and the Products/Completed Work Hazard Aggregate Limit apply separately to, each consecutive 12-month period beginning with the inception date of the Commercial Liability Coverage shown on the ‘declarations.’ ”
In order to determine which limit applies to Pharmacists Mutual’s liability under Coverage L, it is necessary to determine whether the damages claimed by the claimants are the result of bodily 'injury “included in the ‘products/completed work hazard.’ ”• The business-owners policy defines “products/completed work hazard” as follows: . ;
“17. ‘Products/completed work hazard’—
“a, ‘Products hazard’ means ‘bodily injury'.., arising out of ‘products’ after physical possession of the products has been-relinquished to others.
“The ‘bodily injury’ ,.. must occur away from premises [Meds I.V.] own[s] or rentfs] unless [Meds I.V.’s] business includes selling, handling, or distributing ‘products’ for consumption on premises owned by or rented to [Meds I.V.]; and
“b. ‘Completed work hazard’ means ‘bodily injury’ ... occurring away from premises [Meds I.V.] own[s] or rent[s] and arising out of ‘[Meds I.V.’s] work.’ ”
The term “products” is, defined as “goods or products manufactured, sold, handled, distributed, or disposed of by [Meds I.V.].”
In summary, ,in order for the products/completed-work-hazard aggregate limit to, apply to limit Pharmacists Mutual’s liability under Coverage L, there must be: (1) damages (2) based on a bodily injury and (3) the bodily injury must be “included in. the ‘products/completed work hazard.’ ” In order for a bodily injury to be “included in the ‘products/completed work hazard,’ ” that injury must be the result of either a “products hazard” or a “completed work hazard.” In the present case, the circuit court, determined that the claimants’ bodily injuries were caused by a “products hazard.” Therefore, in order for the claimants’ bodily injuries to be considered “included in the ‘products/completed work hazard,’” their bodily injuries must (1) have arisen “out of ‘products’ after physical possession of the products has been relinquished to others” and (2) have been incurred “away from premises [Meds I.V.] own[s] or rent[s].” If it is demonstrated that the claimants’ bodily injuries fit within -this definition, then the products/completed-work-hazard aggregate limit applies to limit Pharmacists Mutual’s liability under Coverage L, If the claimants’ bodily injuries do not fit within this *389 definition, then the general aggregate limit applies to the liability of Pharmacists Mutual under Coverage L.
Based on this interpretation of the business-owners policy, it is evident that a bodily injury cannot both arise “out of ‘products’ after physical possession of the products has been relinquished to others” and be incurred “away from premises [Meds I.V.] own[s] or rent[s]” and, at the same time, not arise “out of ‘products’ after physical possession of the products has been relinquished to others” and be incurred “away from premises [Meds I.V.] own[s] or rent[s].” Under the definition of “products hazard,” why the product caused a bodily injury is inconsequential; it is only consequential that it did cause a bodily injury. Once it is determined that a bodily injury has been caused by a “products hazard,” the products/eompleted-work-hazard aggregate limit alone applies to limit Pharmacists Mutual’s liability for damages arising out of that bodily injury.
In the present case, it is undisputed that the claimants suffered bodily injuries. It is also undisputed that the claimants’ bodily injuries are not “included in the ‘products/completed work hazard.’” Pharmacists Mutual concedes this point. However, the circuit court determined that the claimants’ bodily injuries are, at the same time, both “included in the ‘products/completed work hazard’ and not “included in the ‘products/completed work hazard.’ ” The circuit court reached this conclusion by determining that the claimants’ bodily injuries were caused by multiple, separate, and distinct occurrences. Specifically, the circuit court held that “Pharmacists Mutual has admitted that ... the claimants’ ‘bodily injuries’ .,. were caused by ‘occurrences’ associated with Meds I.V.-’s .‘pharmacy services’—specifically, its ‘compounding’ of TPN.” On this basis, the circuit court concluded that the claimants’ bodily injuries are not “included in the ‘products/completed work hazard’ ” and, thus, that the general aggregate limit applied to Pharmacists Mutual’s liability under Coverage L. The circuit court also held that “there were, at least, three ‘occurrences’ within the meaning of the [policies] that happened during the ‘manufacturing’ of the amino acid solution by Meds I.V.,” and that “those ‘occurrences’ likely contributed to the bodily injuries suffered by the claimants and, in fact, were separate and distinct from the ‘occurrences’ that happened during the ‘compounding’ of the TPN.” The circuit court stated that “[tjhese distinct ‘occurrences’ resulted iri Meds I.V. ‘manufacturing’ defective ‘products’—specifically, multiple batches of amino acid solution contaminated with Serra-tia marcescens.” On this basis, the circuit ■ court concluded that the claimants’ bodily injuries—that is, the same bodily injuries the circuit court concluded are not “included in the ‘products/compl'eted work hazard,’ ” thus subjecting any damagés 'arising out of those bodily injuries to the general aggregate limit[5]—are “included in the *390 ‘products/completed work hazard/” and, thus, that the products/completed'-work-hazard aggregate limit applied to limit Pharmacists Mutual’s liability under Coverage L.
The circuit court’s conclusion is contrary to the plain language of the business-owners policy. Specifically, the plain language of the business-owners policy is clear that a bodily injury is either “included in the ‘products/completed work hazard,’ ” or it is not. A bodily injury cannot simultaneously be and not be “included in the ‘products/completed work hazard.’ ”
Pharmacists Mutual conceded, and the claimants agreed, that the claimants’ bodily injuries are not “included in the ‘products/completed work hazard.’ ”[6] As a result, the circuit court held that Pharmacists Mutual’s liability for damages under Coverage L is limited by the general aggregate limit of $4 million. The circuit court then held, after adopting the parties’ position that the claimants’ bodily injuries are not “included in the ‘products/completed work hazard,’” that the claimants’ bodily injuries are also “included in the .‘products/completed work hazard.’” This holding is inconsistent. As Pharmacists Mutual argues in its brief before this Court, a bodily injury can be caused by only one occurrence. In other words, Pharmacists Mutual is essentially arguing that a bodily injury is either “included in the ‘products/completed work hazard’” or it is not. See Pharmacists Mutual’s brief, at pp. 17-22. For the reasons set forth above, we agree with Pharmacists Mutual that the plain language of the business-owners policy requires such a result. Accordingly, we hold that the circuit court erred in determining that the claimants’ bodily injuries were both “included in the ‘products/completed work hazard’” and, at the same time, not “included in the ‘products/completed work hazard.’ ”
Conclusion
Based on the foregoing, we affirm the summary judgment insofar as it held that the general aggregate limit applied to limit Pharmacists Mutual’s liability to $4 million. However, we reverse the circuit court’s judgment insofar as it held that the products/completed-work-hazard aggregate limit also applied to expand Pharmacists Mutual’s liability by $3 million to $7 million. We remand the case to the circuit court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Stuart, Bolin, Main, and Wise, JJ., concur.
Shaw, J., recuses himself.

. This case was originally assigned to another Justice on this Court; it was reassigned to Justice Parker.

. This appellee is also referred to in the record as Advance Specialty Pharmacy LLC.

.The nature, of the relationship between Advanced Specialty Pharmacy LLC and Meds I,V„ Inc., is unclear from the record, although it is clear that the entities are related.

. Enteral is defined as "[w]ithin, or by way of, the intestine or gastro-intestinal tract, especially as distinguished from parenteral.” Sted-man's Medical Dictionary 597 (27th ed. 2000).

. What is not explicitly stated in the circuit court’s order is that the circuit court determined that each claimant’s bodily injuries were caused by two distinct occurrences. The circuit court concluded that the amino acid manufactured by Meds I.V. was contaminated, which it considered to be an "occurrence,” Based on that occurrence, the circuit court determined that the claimants’ bodily injuries arose from a “products hazard.” That is, the circuit court determined that the claimants suffered bodily injuries that arose out of a product (the circuit court held ‘that the amino-acid solution manufactured by Meds I.V. was a product) after physical possession of the product had been relinquished to the hospitals that administered the TPN. The circuit court then stated that "[t]he contaminated amino acid solution was then incorporated by Meds I.V,, along with other ingredients, to create TPN during the 'compounding' phase, which caused the contamination to reach the *390 claimants and their decedents.” The circuit court considered the compounding of the TPN to be a separate and distinct occurrence. Based on that occurrence, the circuit court determined that the claimants’ bodily injuries the circuit court determined are included in the "products/completed work hazard” are also not included in the "products/completed work hazard.”

. Pharmacists Mutual argued that the claimants’ bodily injuries were caused by "pharmacy services” provided by Meds I.V. Pharma- . cists Mutual argued that bodily injuries caused by "pharmacy services” are necessarily not "included in the ‘products/completed work hazard.’ ” Pharmacists Mutual does not direct this Court's attention to any language in the policies requiring such a result, and nothing in this opinion should be read as deciding that issue.